**ACTIUM LLP**
Mike Gatto, State Bar No. 232674
99 South Lake Avenue, Suite 501
Pasadena, CA 91001
Telephone:  323-819-0300
Email:  mike@actiumllp.com

*Attorneys for Plaintiff*
*Our Clean Oceans Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OUR CLEAN OCEANS INC., a California corporation<br><br>Plaintiff,<br><br>v.<br><br>CORPORATE E-WASTE SOLUTIONS, a California corporation<br><br>Defendant. | Case No.:  8:25-cv-2311<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(under Federal Water Pollution Control Act: 33 U.S.C. §§ 1251 *et seq.*)** |

1

Plaintiff Our Clean Oceans Inc., by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen-suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. ("Clean Water Act" or "CWA").  *See* 33 U.S.C. § 1365.  This Court has subject-matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and/or laws of the United States).

2.    On July 11, 2025, Our Clean Oceans issued a 60-day Notice Letter to Defendant Corporate eWaste Solutions ("Defendant" or "CEWS"), for a facility under its control located at 331 Cliffwood Park Street in Brea, with Waste Discharger Identification Number 8 30I028501 (hereinafter, "the Facility").  The Notice Letter informed Defendant of its violations of the CWA and California's General Industrial Storm Water Permit[1] ("General Permit") at the Facility. The Notice Letter also informed Defendant of Our Clean Ocean's intent to file suit against Defendant to enforce the CWA and General Permit, unless it remedied its violations.

3.    The Notice Letter was sent to Defendant's Yard Supervisor for the Facility, its Registered Agent, its EHS Director, and its CEO, in compliance with 40 C.F.R. § 135.2(a)(2). The Notice Letter was also sent to the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. §

---

[1] National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ) ("1997 Permit"), as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122 – DWQ ("2015 Permit").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

1365(b)(1)(A). The Notice Letter is attached hereto as Exhibit A and is incorporated herein by reference.

4.     More than sixty days have passed since the Notice Letter was served on the Defendant and the aforementioned agencies. Our Clean Oceans is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.    INTRODUCTION

6.     On July 19, 2025, a container of approximately 10-20,000 <u>pounds</u> of electronic waste at the Defendant's facility ignited and caught fire. The lithium batteries that burned required a fire response of course, and as a result, approximately 36,000 gallons of extremely contaminated water made it into the adjacent storm drain, and thus, on information and belief, into Coyote Creek and the ocean.  That incident, which harmed water quality and human health, while spectacular, is sadly not extraordinary.  With every storm, hundreds of millions of gallons of polluted water, originating from industrial operations such as the Facility, pour into storm drains and local waterways.  Water-quality specialists state that stormwater pollution accounts for more than half of the total pollution entering marine and river environments each year.  These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although once abundant and varied fisheries have diminished, these waters are still essential habitat for dozens of fish and bird species and invertebrates. Stormwater and non-stormwater contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high

3

---

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND  CIVIL PENALTIES

concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted stormwater harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

7.    High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

8.    Stormwater discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

9.    Metal contamination has a significant negative influence on flora and fauna in aquatic environments through various forms of heavy metal pollutants due to their stability and toxicity. These heavy metals lead to biological magnification, where the concentration of toxicity increases gradually due to continuous exposure by aquatic living

4

organisms.  This exposure can cause larval and embryonic stages to get affected due to heavy metals, which bring about cause several complexities in fish, such as vertebral column deformities, multiplied coronary heart rate, deformed form, decreased cardiac activity, and increased mortality rate.  Toxic heavy metals include zinc (Zn), copper (Cu), lead (Pb), and nickel (Ni), selenium (Se), and chromium (Cr) which are discharged by CEWS, with zinc and copper in concentrations that exceed applicable numeric effluent limitations (NELs).  Aluminum can also be toxic to water bodies under certain conditions, which CEWS also discharges in concentrations well above the numeric action level (NAL).

10.    This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert-witness fees, for Defendant's substantive and procedural violations of the General Permit and the Clean Water Act, resulting from Defendant's operations at the Facility.

11.    Our Clean Oceans specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the General Permit and the Clean Water Act, which are ongoing and continuous.

III.    PARTIES

12.    Our Clean Oceans is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. Its main office is located at 2618 SAN MIGUEL DR, SUITE 1885, in NEWPORT BEACH.

13.    Our Clean Oceans has members who live and/or recreate in and around Orange County. Our Clean Oceans is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters, particularly our cherished California coastline. To further these goals, Our Clean Oceans actively seeks

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

14.    Our Clean Oceans' members live, work, travel near, recreate in, use and enjoy the waters near the Facility, including affected rivers, wetlands, and beaches, for biking, boating, kayaking, bird watching, riding horses, viewing wildlife, hiking, walking, running, swimming, and engaging in scientific study, including monitoring and restoration activities.

15.    Our Clean Oceans engages in activities throughout Southern California that restore physical habitat.  Our Clean Oceans also contributes to supplemental environmental projects in and near waterways and open space near the Facility.

16.    Discharges of polluted stormwater and non-storm water from the Facility degrade water quality and harm aquatic life in Coyote Creek, the San Gabriel River, its tributaries, and the Pacific Ocean, and impair Our Clean Oceans' and its members' use and enjoyment of those waters.

17.    The violations of the General Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendant's discharge of polluted stormwater from the Facility. Thus, the interests of Our Clean Oceans' members have been, are being, and will continue to be adversely affected by Defendant's failure to comply.

18.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

19.    The interests of Our Clean Oceans and its members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the General Permit. The relief sought will redress the harms to Plaintiff caused by Defendant's activities.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND  CIVIL PENALTIES

20.    Our Clean Oceans is informed and believes, and thereon alleges, that Defendant maintains a headquarters at 331 Cliffwood Park Street in Brea.

21.    Our Clean Oceans is informed and believes, and thereon alleges, that Defendant is the operator of the Facility.

22.    Our Clean Oceans occasionally refers to Defendant and its management as the "Owners/Operators" of the Facility.

23.    Our Clean Oceans is informed and believes, and thereon alleges, that Defendant is an active California corporation registered in California.

24.    Our Clean Oceans is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Defendant is Chun Yu "Eric" Chu, who reports a mailing address at 331 Cliffwood Park Street in Brea, CA 92821.

## IV.    STATUTORY AND REGULATORY BASIS

### A. The Clean Water Act

25.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

26.    Section 402(p) of the CWA establishes a framework for regulating municipal and industrial stormwater discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial stormwater discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial stormwater dischargers. 33 U.S.C. § 1342.

7

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

27.     Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

28.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

29.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

30.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2. 31.

31.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

32.     "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

33.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in

8

interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

34.    The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

35.    The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States* (2006) 547 U.S. 715; *see also N. Cal. River Watch v. City of Healdsburg* (9th Cir. 2007) 496 F.3d 993.

36.    A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

37.    A significant nexus is also established if waters that are tributary to navigable waters have flood-control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-01.

38.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation."  *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

39.    The Defendant is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND  CIVIL PENALTIES

40.    An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

41.    Pursuant to sections 309(d) and 505 of the Clean Water Act, each separate violation of the CWA occurring after November 2, 2015 and assessed on or after January 15, 2018 subjects the violator to a penalty of up to $53,484 per day. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

42.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B**. **California's General Permit (Storm Water Permit)**

43.    Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted stormwater.

44.    States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial stormwater discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial stormwater dischargers. *See id.*

45.    Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal. App. 4th 1377, 1380-81.  In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

46.     The General Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the General Permit are also violations of the CWA. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

47.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

48.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

49.     On July 1, 2015 the 2015 Permit became effective and was issued as NPDES General Permit No. CAS000001 (the same NPDES permit number as the 1997 Permit). 2015 Permit, Section I(A) (Finding 4). The 2015 Permit superseded the 1997 Permit except for enforcement purposes. *Id.* at Section I(A) (Finding 6). The substantive requirements of the 2015 Permit are the same or more stringent than the requirements of 1997 Permit.

50.     On November 6, 2018, the State Board issued an amended but not yet adopted Order No. 2018-0028-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit").

51.     To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the General Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, p. II-V; 2015 Permit, Section I(A)

11

(Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Provision E(1), Finding 3; 2015 Permit, Section I(A) (Finding 17), Section II(B).

52.    Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

**C**. **The General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

53.    The General Permit contains certain absolute prohibitions. It prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III(B).

54.    Effluent Limitation (B)(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in stormwater discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND  CIVIL PENALTIES

55.     Discharge Prohibition (A)(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.

56.     Under the CWA and the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution. 33 U.S.C. § 1311(b); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

57.     The EPA established Parameter Benchmark Values for the following parameters, among others, are as follows: Total Suspended Solids—100 mg/L; Oil & Grease—15 mg/L; Aluminum – .75 mg/l; Iron—1 mg/l; Lead—.069 mg/l; Copper— .0123 mg/l; Zinc—.11 mg/L; and pH—6-9 s.u. The Basin Plan's Water Quality Standards for the relevant region are even more stringent. The 2015 Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values.

58.     The 2015 Permit includes NALs. 2015 Permit, Section I(M) (Finding 62). During the public commenting period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* 2015 Permit Section I(M) (Finding 63).

13

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

59.     Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit stormwater discharges from adversely impacting human health or the environment.

60.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the General Permit's Receiving Water Limitation.

61.     Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) of the 2015 Permit prohibit stormwater discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

62.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

63.     California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

64.     The Santa Ana Regional Water Quality Control Board has issued the Water Quality Control Plan for the region where the Facility is located ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury and states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses.

65.     The Basin Plan also sets forth water-quality standards and prohibitions applicable to Defendant's stormwater discharges. The Basin Plan includes a narrative toxicity standard which states that "[t]oxic substances shall not be discharged at levels that

14

will bioaccumulate in aquatic resources to levels which are harmful to human health." Further, "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses." *Id.* Additionally, the Basin Plan's Water Quality Standards also require a lesser pH range of 6.5 – 8.5 pH units than the General Permit for inland surface waters such as the Santa Ana or San Gabriel Rivers and their watersheds. *Id.*

66.    Waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act.

67.    Pursuant to Clean Water Act Section 303(d)'s list of impaired waterbodies, the Santa Ana River Reach 3 is impaired for Cu, Lead (Pb), and Indicator Bacteria. Pursuant to the SWRCB's applicable HUC-10 watershed (Lower San Gabriel River), the Facility's watershed is impaired for Pb, Cu, Nitrate, Nitrite, Total Nitrogen, Dissolved Oxygen (DO), Phosphorous (P), temperature, pH, E. Coli, and Enterococcus.

68.    In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

69.    The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L. 2

70.    The CTR includes further numeric criteria set to protect human health and the environment in California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND CIVIL PENALTIES

71.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

72.     Receiving Water Limitations C(3) and C(4) of the 1997 Permit require a permittee whose discharges exceed the General Permit's Receiving Water Limitations to submit a written report identifying what additional BMPs will be implemented to achieve water quality standards.

**D**. **The General Permit's Stormwater Pollution Prevention Plan Requirements**

73.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

74.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-

16

generating activities, nearby water bodies, and pollutants control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

75.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to stormwater, and to reduce or prevent the discharge of polluted stormwater from industrial Facility. 1997 Permit, Section A(2); 2015 Permit, Section X.

76.    The General Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the General Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9). The General Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

77.    Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND CIVIL PENALTIES

date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the General Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the General Permit. *Id.*, Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the General Permit. *Id.*

78.    The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via SMARTS within 30 days. 2015 Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); 2015 Permit, Fact Sheet, Section II (I)(1).

**E**. **The General Permit's Monitoring and Reporting Requirements**

79.    The 1997 Permit required facility operators to develop and implement a monitoring and reporting plan ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2) and E(3). The M&RP must have ensured that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *Id.* at Section B(2). The M&RP must have ensured that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

80.    The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that stormwater and non-stormwater discharges are in compliance with the General Permit's Discharge Prohibitions,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Section XI.

81.    The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in stormwater discharges. *Id.*, 1997 Permit Section B(2)(c) and B(2)(d).

82.    The 2015 Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

83.    Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the M&RP shall be revised as necessary to ensure compliance with the General Permit.

84.    Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of stormwater discharges.

85.    Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in stormwater discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting stormwater discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3). The General Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

86.    The General Permit requires dischargers to visually observe and collect samples of stormwater discharges from all locations where stormwater is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

87.    Section B(5)(a) of the 1997 Permit requires dischargers to collect stormwater samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All stormwater discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

88.    Section B(5)(b) of the 1997 Permit requires that sampling conducted pursuant to the General Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without stormwater discharge.

89.    Section B(5)(c)(i) of the 1997 Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

90.    Section B(5)(c)(ii) of the 1997 Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the stormwater discharged from the facility.

91.    Section B(14) of the 1997 Permit requires that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

92.    Section B(15)(f) of the 1997 Permit requires that sampling and analysis be performed according to Section B of the 1997 Permit.

20

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

93.    Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

94.    Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze stormwater samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

95.    Section XI(B)(6) of the 2015 Permit requires dischargers to analyze stormwater samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

96.    The SWPPP requires testing at the facility for various pollutants.

97.    Section XVI of the 2015 Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.    STATEMENT OF FACTS

### A. Facility Site Description

98.    The Facility is located at 331 Cliffwood Park Street in Brea, and conducts industrial activities that are subject to the General Permit. The Facility's NOI lists its

Standard Industrial Classification ("SIC") code as 5093 (Scrap and Waste Materials), which requires General Permit coverage.

99.    The Facility's Waste Discharge Identification (WDID) number is 8 30I028501, and the Facility's NOI and SWPPP state the site comprises 182,952 square feet, 100% of which is impervious, with 36,590 square feet exposed to storm water. CEWS is an e-waste recycler that separates materials into commodity units such as plastic, metals, and glass through various processing technologies. CEWS handles all e-waste and plastic stream lifecycle needs, creating customized solutions for difficult and complex scrap.

100.    According to the Facility's most recent SWPPP on SMARTS, dated 9/16/2025, industrial activities conducted at the Facility include, but are not limited to: dismantling, metals sorting and separation, material storage and handling (including electronic devices, cathode-ray tubes, appliances, plastics, cardboard, and used pallets), loading and unloading, vehicle/forklift traffic, equipment maintenance, and storage of hazardous materials and wastes such as electronic components, batteries, used oils and grease, used absorbent, contaminated soil, and wastes from hazardous spill cleanups.

101.    Our Clean Oceans is informed and believes and thereon alleges that CEWS conducts industrial activities both indoors and outdoors and that its indoor industrial activities have exposure to the outdoors. Industrial materials are handled and stored at various locations throughout the facility, either outdoors without adequate cover to prevent storm water exposure and/or without adequate BMPs to prevent tracking to the outdoors, and without adequate treatment measures to prevent polluted storm water and non-storm water from discharging the facility. Many pollutants associated with industrial activities occurring indoors or under partial cover regularly escape to the outdoors via wind dispersion, track out, or otherwise, resulting in pollutant dispersal throughout the facility, and off the facility through ingress and egress and rain events.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

102.   For example, the Facility's most recent SWPPP identifies oil and grease from metals, metal liquid wastes, assorted/mixed waste fluids, oily soil, solvents, acids, metal dusts, metal powders, and metal chips as pollutant sources. These types of pollutants are easily tracked outdoors by foot and forklift traffic. Accordingly, the SWPPP states "The indoor storage area is concrete paved but tracking out of pollutants is a concern, " and "The indoor bins are pollutants source by tracking out pollutants and when they are unloading them into the containers."

103.   Additionally, the metal chips, metal dusts, metal dusts from oxidized and corroded metals, metal powders, and shredded paper, identified in the Facility's SWPPP as associated with the Facility's industrial activities, are prone to outdoor exposure via aerial dispersion/deposition and track out through building roof vents and/or exhausts. Moreover, sources available to OCO indicate the typical dust and particulate generating industrial activities associated with the Facility's recycling operations as dismantling, shredding (metal), compacting (metal), and melting/burning. Notably, the Facility's building roof is equipped with a significant amount of unidentified appurtenances and equipment, with some appearing to be roof vents and/or exhausts which are a dispersion source of pollutants from indoor industrial activities to the outdoors through the Facility's building ventilation system. This is evidenced by the dark staining at numerous locations along the northern portion of the Facility's building roof, indicating accumulation of pollutants from indoor industrial activities to the outdoor roof surfaces. This is further evidenced by the Facility's WQBCA Plans, dated 12/16/2023 and 3/11/2025, which both identify "[t]he discharge of storm water runoff from rooftop to the site" as a potential source contributing to the NEL exceedances occurring at the Facility. Thus, OCO believes the Facility has more square footage exposed to storm water than stated in its NOI and SWPPP because of industrial related particulates accumulating on its roof surfaces.  In addition to the tracking of pollutants from the Facility's indoor industrial activities to the

23

outdoors, the Facility's historical ERA and WQBCA reporting repeatedly identifies CEWS' exposed outdoor industrial activities as sources of the ongoing exceedances at the Facility as well. For example, the Facility's Level 1 ERA Report from December 2021 identifies metal particles on ground surfaces and uncovered roll-off bins containing metal particles as sources of the Total Suspended Solids (TSS), Iron (Fe), and Aluminum (Al) exceedances at CEWS. The Facility's WQBCA Plan from December 2023 recognizes electrical waste with copper components, dust from vehicle brake shoes, spills of vehicle waste oils, and copper components from oxidized old metal parts as sources of the Facility's Copper (Cu) exceedances. Similarly, the Facility's Level 1 ERA Report from February 2023 identifies metals and electrical motors with copper components, spills of waste with copper components, and oxidized old metal parts with copper components as sources of the Copper (Cu) exceedances. The Facility's WQBCA Plan from March 2025 identifies electrical waste with Zinc (Zn) components and an exposed scrap bin as contributing to the Zn exceedances. Notably, the above-mentioned plans and reports consistently state the same or extremely similar source control deficiencies while also continually identifying lack of BMP implementation at the site and poor housekeeping and management as reasons for these deficiencies. This demonstrates the Facility's continued failure to address the recognized deficiencies contributing to its exceedances.

104. Based on information within the Facility's SWPPP, CEWS's industrial activities generate potential pollutants including, but not limited to: pH, Oil & Grease (O&G), TSS, Fe, Al, Zn, Cu, Lead (Pb), Cadmium (Cd), Nickel (Ni), Selenium (Se), Chromium (Cr), and Chemical Oxygen Demand (COD). However further investigation into the Facility's material Safety Data Sheets (SDSs), industrial activities, and waste byproducts is likely to result in the discovery of additional pollutants. As an example, the wooden pallets and associated wood debris, cardboard, and shredded paper present at the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND CIVIL PENALTIES

Facility are sources of Dissolved Oxygen (DO), for which the Facility's watershed is impaired.

105.   The Facility is required to analyze for pH, TSS, O&G, Fe, Pb, Al, Zn, and COD pursuant to its SIC Code. Facilities must also sample and analyze additional parameters identified on a facility specific basis based on pollutant source assessments, receiving water impairments, or as otherwise required by the Regional Board. (General Permit Section XI.B.6). Pursuant to Clean Water Act Section 303(d)'s list of impaired waterbodies, the Coyote Creek is impaired for Ammonia (NH3), Diazinon, E. Coli, Enterococcus, Dissolved Cu, Pb, and pH. Pursuant to the SWRCB's applicable HUC-10 watershed (Lower San Gabriel River), the Facility's watershed is impaired for NH3, Cyanide (CN), Diazinon, Dioxin, DO, E. Coli, Enterococcus, Coliform Bacteria, Se, Pb, Cu, Dissolved Cu, Ni, Nitrate, Nitrite, Total Nitrogen, Phosphorous (P), PCBs, Chlordane, and pH. Additionally, the facility is subject to the San Gabriel River Metals and Selenium TMDL (Coyote Creek and/or its Tributary/Tributaries) which consists of Cu, Pb, and Zn.

106.   The Facility's self-reported sampling results indicate exceedances of numerous parameters, including the applicable TMDL Numeric Effluent Limitations (NELs) for Cu and Zn. An exceedance of an NEL is a violation of the General Permit. (General Permit Attachment C). Violations of the General Permit are violations of the CWA. Storm water from the Facility discharges via the local storm sewer system and/or surface runoff indirectly into the aforementioned receiving waters. Consequently, these illegal discharges of polluted storm water impact OCO's members use and enjoyment of the Facility's receiving waters by contributing to the degradation of these already impaired surface waters, and by posing risks to human well- being, aquatic life, and ecosystem health.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

**B. Defendant's Many Violations**

107.    Any person or facility discharging storm water associated with industrial activity must comply with the General Permit. (See 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1); General Permit Fact Sheet at VII). Moreover, pursuant to Section I.A.8 of the General Permit, a facility operator must "comply with all requirements, provisions, limitations, and prohibitions in this General Permit." Failure to comply with the Industrial General Permit is a Clean Water Act violation. (Industrial General Permit Section XXI.A). As an enrollee, CEWS has a duty to comply with the Industrial General Permit and is subject to all of the provisions therein.  Based on Our Clean Ocean's review of available public documents, primarily from SMARTS, Our Clean Ocean is informed and believes and thereon alleges that Defendant is in ongoing and continuous violation of both the substantive and procedural requirements of the CWA and the General Permit at the Facility. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the CWA, Defendant and its Owners and/or Operators are subject to penalties for these violations of the CWA since at least July 11, 2020.

108.    Defendant's stormwater sampling results provide conclusive evidence of its failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations. Self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil* (9th Cir. 1988) 813 F.2d 1480, 1493.

109.    The General Permit requires that stormwater discharges and authorized non-stormwater discharges shall not cause or threaten to cause pollution, contamination, or nuisance. (General Permit Section III.C.) The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Board Basin Plan or other statewide water quality requirements. (General Permit Section III.D). Furthermore,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

stormwater discharges and authorized non-storm water discharges shall not adversely impact human health or the environment and shall not cause or contribute to a violation of any water quality-based effluent limitation. (General Permit Sections VI.A, VI.B). Upon determination that stormwater discharges from a discharger are causing or contributing to an exceedance of water quality standards, a discharger is required to conduct a facility evaluation, identify pollutant sources, and prepare and submit documentation to the Regional Board stating which BMPs and SWPPP implementation measures are necessary to reduce any pollutant in its stormwater discharges that is causing or contributing to an exceedance of water quality standards. (General Permit XX.B).

110.    The CTR sets the applicable water-quality standard under the Permit, the violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015).  The CTR establishes numeric receiving water limits for toxic pollutants in California surface waters. (40 C.F.R. § 131.38). As such, the CTR has established a numeric limit for the following pollutants alleged to be discharged by the Facility: Copper (0.013 mg/L), Zinc (0.12 mg/L), Cadmium (0.0043 mg/L), Lead (0.065 mg/L), Nickel (0.470 mg/L, Chromium III (0.550 mg/L), and Chromium VI (0.016 mg/L).

111.    The Water Quality Control Plan for the Santa Ana Region ("Basin Plan") also sets forth water quality standards and prohibitions applicable to CEWS's storm water discharges. The Basin Plan includes a narrative toxicity standard which states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." (Santa Ana Region Basin Plan). Further, "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses." Id. Additionally, the Basin Plan's Water Quality Standards also require a lesser pH range of 6.5 – 8.5 pH units than the General Permit for inland surface waters such as the Coyote Creek and its watershed. Id.

27

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

112. The Effluent Limitations of the Industrial General Permit prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants3 and best conventional pollutant control technology ("BCT") for conventional pollutants. (General Permit Section I.D). Specifically, the Permit "requires control of pollutant discharges using BAT and BCT to reduce and prevent discharges of pollutants, and any more stringent effluent limitations necessary for receiving waters to meet applicable water quality standards." *Id.* Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand, and fecal coliform. (40 C.F.R. § 401.16). All other pollutants are either toxic or nonconventional. *Id.*; 40 C.F.R. § 401.15.

113. The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial stormwater has implemented the requisite BAT and BCT. *Santa Monica Baykeeper v. Kramer Metals* (C.D. Cal. 2009) 619 F.Supp.2d 914, 920, 923; General Permit Section XII.A. These benchmark levels are reflected as NAL values in the General Permit. (*See* below for applicable NAL Values). A discharger that exceeds an NAL must comply with the ERA requirements in Section XII of the General Permit. The General Permit also requires a permittee whose discharges violate the General Permit's Receiving Water Limitations or water quality standards, such as TMDL NELs and CTR limits to implement additional BMPs to attain compliance with the receiving water limitation or standard. A Discharger that is notified by a Regional Board or who determines its discharge is causing or contributing to an exceedance of a water quality standard must comply with the water quality based corrective actions in Section XX.B of the General Permit. The General Permit also requires a permittee whose discharges violate the General Permit's Receiving Water Limitations or water quality standards, such as TMDL NELs and CTR limits to implement additional BMPs to attain compliance with the receiving water limitation or standard. A Discharger that is notified by a Regional Board

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

or who determines its discharge is causing or contributing to an exceedance of a water quality standard must comply with the water quality based corrective actions in Section XX.B of the General Permit.

114.   Section XI.B.4 of the General Permit requires samples to be representative of storm water associated with industrial activities at a facility and collected from each drainage area at all discharge locations unless an exception in section XI.C.4 of the General Permit is applicable. The requirement of representative storm water sampling includes collecting samples from the appropriate discharge locations representative of industrial activities and ensuring that the measurements taken for the purpose of monitoring be representative of those monitored activities. (General Permit Section XXI.J.1).

115.   Prior to the CEWS' recent SWPPP update on SMARTS dated 9/16/2025, CEWs' prior SWPPPs illustrated two (2) sampling locations at the Facility but failed to name them for identification purposes. Pages 55 and 57 of the Facility's SWPPP merely stated, "Two storm water discharge points have been identified for this Facility" and "Two storm water discharge points were observed at this facility." Thus, the SWPPP failed to provide a narrative explanation of where these discharge points were located and also failed to identify them by name. Moreover, the Facility's chain of custodies and sample results only identified these discharge/sample points as DP1 and DP2. As a result, the Facility's documentation provided no means for associating DP1 and DP2 with their corresponding physical locations on the Facility's site map or for associating the Facility's sample results with their corresponding physical locations.  <u>Therefore, CEWS' sampling documentation for the five-year period applicable to this notice fails to properly authenticate or verify its monitoring as required</u>.

116.   Furthermore, information available to OCO indicates the Facility's inaccurate assessment of its industrial storm water drainage, discharge locations, and potentially required sample locations. For example, the site map illustrates storm water flowing from

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

the two (2) driveways at the "Employee Parking Area" towards the Facility rather than away from it, although all driveways are made to slope downwards directing sheet flow away from facilities. Notably, the Facility's own Level 1 ERA Report from December 2021 contradicts the site map by stating, "media filter socks will be implemented across the entrance gates," which is supported by the SWPPP stating "storm water run-on from surrounding area was not identified." Collectively, this information indicates that storm water does discharge from the driveways (i.e. entrance gates) at the "Employee Parking Area" and that they are not appropriately identified as discharge locations or assessed as potentially required sample locations. This failure is magnified by the industrial material storage areas and portable loading dock located within the "Employee Parking Area." Furthermore, the site map depicts storm water from the western portion of the Facility flowing southward while depicting storm water from the eastern portion of the Facility flowing northward. Contrasting flow directions of this nature at a Facility with relatively flat topography is extremely unlikely without drainage conveyances facilitating such inconsistent flow direction(s). However, the Facility's site map and SWPPP both fail to depict and/or explain any conveyances directing storm water in this manner. Accordingly, these examples demonstrate additional inaccuracies that prevent OCO from determining whether CEWS' sampling is representative of all industrial activity at the Facility. Therefore, without a Facility inspection, OCO is unable to ascertain whether CEWS is sampling from properly selected locations that represent the true character of industrial storm water discharging the Facility.

117. Additionally, the Facility has an extensive history of failing to analyze its storm water samples for all of the parameters its SWPPP identifies as required by the General Permit. The Facility's SWPPP states, "The pollutants likely to be present in the industrial storm water runoff from this facility are oil and grease, metals like iron, aluminum, zinc, chromium, copper, lead, cadmium, acid/basic substances, and nickel, as

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND CIVIL PENALTIES

well as total suspended solid and total dissolve solid." Despite this, the Facility's SWPPP does not identify Ni and Cr as required for analysis, and the Facility has failed to analyze its storm water discharge for Ni and Cr during the five (5) year period applicable to this notice. The SWPPP does identify Cu, Cd, and Se as required for analysis in the table on Pages 59-60, and the BMP Summary Table in the SWPPP repeatedly identifies Cu and Cd as industrial pollutants. However, the Facility failed to analyze Cu for the samples collected on 3/10/2020 and 3/15/2021; failed to analyze Cd for the samples collected on 3/10/2020, 3/10/2021, 3/15/2021, 12/14/21, 12/23/21, and 11/8/22; and has failed to analyze for Se during the five (5) year period applicable to this notice. As a result, the Facility has been in violation of the General Permit since at least 3/10/2020.

118.    OCO further alleges that additional NAL exceedances would have been reported had the Facility sampled four (4) times per reporting year as required by General Permit Section XI.B(2). The Facility only sampled two (2) times during the 2020-2021 and 2021-2022 reporting periods and failed to sample in the first half of the storm water year (July 1 - December 31) during the 2020-2021, 2023-2024, and 2024-2025 reporting years as required. These failures to collect and analyze the requisite amount of storm water samples took place although qualifying storm events (QSEs) occurred during these periods. Consequently, the Facility's sample results in the below table do not reflect the true volume of parameter exceedances occurring at the Facility. Additional exceedances would have been reported had the Facility sampled the requisite number of times per reporting year for all potential pollutants as required by General Permit.

119.    The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations, and effluent limitations of the General Permit.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND  CIVIL PENALTIES

| Date of Sample | Discharge Point | Parameter | Result | NAL Value | NEL Value |
|---|---|---|---|---|---|
| 3/10/21 | DP2 | Iron | 1.04 mg/L | 1.0 mg/L | - |
| 3/15/21 | DP1 | Iron | 1.89 mg/L | 1.0 mg/L | - |
| 2/24/23 | DP1 | Iron | 1.1 mg/L | 1.0 mg/L | - |
| 2/24/23 | DP2 | Iron | 1.12 mg/L | 1.0 mg/L | - |
| 3/29/23 | DP1 | Iron | 2.67 mg/L | 1.0 mg/L | - |
| 3/29/23 | DP2 | Iron | 1.33 mg/L | 1.0 mg/L | - |
| 1/3/24 | DP1 | Iron | 1.19 mg/L | 1.0 mg/L | - |
| 3/12/25 | DP2 | Iron | 1.55 mg/L | 1.0 mg/L | - |
| 3/10/21 | DP2 | Aluminum | .82 mg/L | .75 mg/L | - |
| 3/15/21 | DP1 | Aluminum | 1.5 mg/L | .75 mg/L | - |
| 3/15/21 | DP2 | Aluminum | .85 mg/L | .75 mg/L | - |
| 2/24/23 | DP1 | Aluminum | .812 mg/L | .75 mg/L | - |
| 2/24/23 | DP2 | Aluminum | 1.76 mg/L | .75 mg/L | - |
| 3/29/23 | DP1 | Aluminum | 2.98 mg/L | .75 mg/L | - |
| 3/29/23 | DP2 | Aluminum | .86 mg/L | .75 mg/L | - |
| 2/19/24 | DP1 | Aluminum | 1.24 mg/L | .75 mg/L | - |
| 3/12/25 | DP2 | Aluminum | 4.58 mg/L | .75 mg/L | - |
| 3/10/21 | DP2 | Total Suspended Solids | 268 mg/L | 100 mg/L | - |
| 3/15/21 | DP1 | Total Suspended Solids | 126 mg/L | 100 mg/L | - |
| 3/12/25 | DP2 | Total Suspended Solids | 132 mg/L | 100 mg/L | - |
| 12/14/21 | DP1 | Copper | .18 mg/L | .0332 mg/L | .027 mg/L |
| 12/14/21 | DP2 | Copper | .17 mg/L | .0332 mg/L | .027 mg/L |
| 12/23/21 | DP2 | Copper | .088 mg/L | .0332 mg/L | .027 mg/L |
| 12/30/22 | DP1 | Zinc | .25 mg/L | .26 mg/L | .158 mg/L |
| 12/30/22 | DP2 | Zinc | .25 mg/L | .26 mg/L | .158 mg/L |
| 1/3/24 | DP1 | Zinc | .282 mg/L | .26 mg/L | .158 mg/L |
| 1/3/24 | DP2 | Zinc | .255 mg/L | .26 mg/L | .158 mg/L |
| 1/22/24 | DP1 | Zinc | .194 mg/L | .26 mg/L | .158 mg/L |
| 2/1/24 | DP1 | Zinc | .207 mg/L | .26 mg/L | .158 mg/L |
| 2/19/24 | DP1 | Zinc | .398 mg/L | .26 mg/L | .158 mg/L |
| 2/6/25 | DP1 | Zinc | .60 mg/L | .26 mg/L | .158 mg/L |
| 2/13/25 | DP2 | Zinc | .166 mg/L | .26 mg/L | .158 mg/L |
| 3/5/25 | DP1 | Zinc | .93 mg/L | .26 mg/L | .158 mg/L |
| 3/12/25 | DP2 | Zinc | 1.66 mg/L | .26 mg/L | .158 mg/L |
| 1/3/24 | DP2 | COD | 121 mg/L | 120 mg/L | - |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

| 3/12/25 | DP2 | COD | 374 mg/L | 120 mg/L | - |

120.    Based on CEWS's self-reported data, CEWS's industrial storm water discharges illustrate a pattern of exceedances of water quality standards. This pattern of exceedances indicates that CEWS has failed and is failing to employ measures that constitute BAT and BCT in violation of the requirements of the General Permit. The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations, and effluent limitations of the General Permit.

121.    To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. (See General Permit Sections X.H.1-2). CEWS could not have done this when its Zn results have exceeded the NEL eleven (11) times over the last three (3) reporting periods, with the most recent sample from 3/12/25 demonstrating a Zn concentration over six (6) times the NAL. Despite the numerous ERA and WQBCA reports and plans submitted by the Facility to purportedly eliminate these exceedances, the Facility's most recently collected sample also demonstrated an Al concentration over six (6) times the NAL, a COD concentration over three (3) times the NAL, and TSS in excess of the NAL

122.    Accordingly, CEWS has failed to implement the minimum BMPs required by the General Permit at the Facility, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. (General Permit Sections X.H.1(a–g)). CEWS has also failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including exposure minimization BMPs; storm water containment and discharge reduction

33

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

BMPs; and treatment control BMPs. (General Permit Section X.H.2.) The BMPs described in the Facility's SWPPP are insufficient to prevent the NEL and NAL exceedances for the parameters listed above. Furthermore, the BMPs described in the Facility's ERA Reports and WQBCA Plans are also inadequate.

123.    For example, the Facility's numerous ERA Reports and WQBCA Plans from 12/27/21 - present just recycle the same BMP recommendations with slightly varied phrasing and/or exact duplication. The following are examples of the minimum BMPs selected for implementation that have essentially been restated in the Facility's historical ERA and WQBCA reporting: implement new daily housekeeping, spill response, and waste management procedures; minimum BMPs will be implemented more frequently; all employees have been assigned to clean and maintain their working area clean; cover and tarp roll-off bins prior to the onset of a rain event; the recycling metals with metal components will be separated and covered or stored indoors to avoid contact with storm water; scrap metal parts with zinc component will be covered or placed under roof any time that there is 50% chance of rain; scrap metal parts with aluminum component will be covered or placed under roof any time that there is 50% chance of rain; metal parts will be collected, piled, and covered when rains will be expected; and roll off containers will be covered when rain is expected. This pattern of regurgitation reflects the Facility's failure to consistently maintain the minimum BMPs required to limit the exposure of metals and other pollutants in its storm water discharges and to correct the recurring inadequacies contributing to the ongoing exceedances at the Facility.

124.    Similarly, the following are examples of the advanced BMPs selected for implementation that have essentially been restated in the Facility's ERA and WQBCA reporting: prior to a 50% forecast of rain, media filter socks will be implemented across the entrance gates; prior to a 50% forecast of rain, media filter socks will be implemented and placed across the DP; media filter has been purchased and will be placed at different

34

down grading locations when there is 50% of expected QSE; two different media filters will be placed at the discharge points, one type of media filter will be for suspended solids and the other type will be for removal of dissolved metals; media filter and ionic exchange resin will be placed around the areas where scrap metals with aluminum components are stored when 50% of QSE is expected; media filter will be placed at different locations of the yard when there is 50% of QSE is expected. Notably, the above only contains general references to media filter socks and media filters without providing a brand and fails to identify the expected removal rates of these devices, their filtration capacity pertaining to storm water volume or flow rates, or how the Facility plans to maximize the contact time of storm water with these devices by reducing the potential for storm water overflow and bypass. Similarly, the Facility's SWPPP also fails to provide this information, fails to identify any implemented media at all, and only refers to a filter one (1) time as follows: "Storm water runoff from the loading and unloading areas will be partially pretreat with roll socks with filter and absorbent before it will be discharged in a near future." Moreover, the aforementioned reports and plans consistently fail to provide definitive locations where these filtration devices will be placed, using phrases such as: "across the DP(s), " "at different down grading locations, " "around the areas where scrap metals with aluminum components are stored," and "at different locations of the yard, " all without specification This lack specification prevents an accurate assessment of the effectiveness of these measures and limits the ability of Facility personnel to receive adequate training for effective implementation of these measures. Unsurprisingly, every ERA and WQBCA report/plan from 2/5/23 to present identify "failure to install filter media sock in the discharge points" as a deficiency contributing to the Facility's exceedances, and state "Employees will be retrained on BMPs implementation and storm water sampling procedures" as a corrective action. Typically, a device intended to filter pollutants is considered an advanced BMP. To ensure the effectiveness of these types of control

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

measures, they are required to meet the General Permit's design storm standards. (General Permit Section X.H.2.b.iii). The design standards for treatment control BMPs are listed in General Permit Section X.H.6.a-b. and are generally calculated based upon either the volume of storm water run-off produced by the 85th percentile 24-hour storm event, or the maximum flow rate of storm water run-off produced by the 85th percentile hourly rainfall intensity. The Facility's reports, plans, and SWPPP all fail to explain whether the media filter socks and media filters that were purportedly installed are capable of treating the sufficient storm water volume or flow rate to comply with the General Permit's design standard relative to the volume of run-off from areas of the Facility they are expected to treat. This information is critical for determining whether these filtration devices are an adequate, effective BMP. Consequently, OCO alleges that the media filter socks and media filters result in an insufficient amount of the Facility's discharge actually being filtered, allowing for bypass of unfiltered polluted discharge. The Facility's ERA and WQBCA reports/plans exhibit numerous contradictions that raise concerns about their accuracy and effectiveness. For example, the Facility's WQBCA Plan for Cu, dated 12/16/23, states, "The storm water run on from the neighboring business will be diverted from discharge to the yard." Similarly, the Facility's Level 2 ERA Plan for Al, dated 12/30/23, states, "The storm water running on from neighbor building's rooftop will be diverted from discharge to the yard." However, the Facility's SWPPP explains that run-on is not an issue at the Facility on Page 64 as follows: "Two storm water discharge points were observed at this facility, affect by storm water runon from surrounding area was not identified, and sampling points are accessible." These ERAs also fail to include evidence substantiating that the roofs of neighboring businesses are discharging Cu and Al. As another example, the Facility's Level 2 ERA Plan, dated 12/30/23, also states, "Filter media have been placed in the storm water inlets grills to filter runoff." However, the Facility's site map only depicts one storm drain rather than multiple "storm water inlets grills." This seems to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

confirm OCO's allegation that the Facility's SWPPP and site map fail to account for all storm drains at the Facility and substantiate OCO's related concern that CEWS' sampling is not representative of all industrial activity at the Facility. Furthermore, the Facility's Level 1 ERA Report, dated 12/27/21, states, "media filter socks will be implemented across the entrance gates" although the site map depicts no discharge from these gates/driveways. Moreover, the Facility's WQBCA Plan from 12/16/2023, Level 2 ERA Action Plan from 12/30/23, Level 2 ERA Technical Report from 12/27/24, and WQBCA Plan from 3/11/2025 all state "Reduction or losses of workers to clean the yard during the Covid- 19 pandemic" as a contributing cause of the Facility's exceedances despite the COVID-19 restrictions being lifted on June 15, 2021, and the samples referred to in these reports/plans being collected after June 15, 2021. Additionally, information available to OCO indicates that the Facility has failed to implement certain advanced BMPs referenced in its ERA and WQBCA reports and plans. The Facility's Level 1 ERA Report, dated 2/5/23, states, "The following is a summary of the BMPs that are or will be implemented during (during the 2022 - 2023 wet season) to comply with IGP NAL for copper" and includes: "Trenches with grills will be placed in the yard to management runoff and sediment. In a near future submergible water pumps may be placed at the discharge points (entrances) to collect and pretreat the storm water runoff before it will be discharged if NALs continua exceedance" and "New Structure BMP (new trenching at the entrances) will be constructed in a future if needed." However, neither the Facility's SWPPP nor site map verify implementation of these BMPs, and no trench drains are visible from Google Earth. Further, as explained above, the site map depicts the driveways/entrances as having no discharge, raising questions about what the Facility's actual discharge locations are, and casting doubt on the legitimacy of these proposed BMPs. Furthermore, the ERA and WQBCA reports/plans have repeatedly dangled an advanced treatment system as a proposed BMP for implementation if exceedances continued at the Facility. The Level 1 ERA Report from

37

2/5/23, the WQBCA Plan from 12/16/2023, the Level 2 ERA Action Plan from 12/30/2023, the Level 2 ERA Technical Report from 12/27/24, and the WQBCA Plan from 3/11/25 state the following in sequential order: "The Company will consult cost of storm water holding tanks, construction of storm water collection system, and a filter unit to treat the collected storm water if the BMPs failed to bring into compliance the discharge with NALs;" "If the advanced BMPs implementation failed to comply with NEL, a treatment alternative method or advanced BMPs will be considered to install at the site to treat all the storm water runoff. The treatment method or advance BMPs will be submitted and uploaded in SMARTS;" "The company may need to purchase holding water tanks and a filter unit to collect and filter some storm water if the BMPs failed to meet NAL;" "Storm water collection and treatment unit will go for bidding cost estimate if needed;" and "If the advanced BMPs implementation failed to comply with NEL, a treatment alternative method or advanced BMPs will be considered to install at the site to treat all the storm water runoff." Despite these repeated assertions and continuing NEL and NAL exceedances, the Facility has failed to install a treatment system. Consequently, OCO alleges the Facility lacks a genuine intent to follow through with its own recommendations for measures required to prevent future exceedances. Section II.E.1. of the General Permit Fact Sheet states, "Failure to comply with these additional Water Quality Based Corrective Action requirements is a violation of this General Permit. If additional operational source control measures do not adequately reduce the pollutants, Dischargers must implement additional measures such as the construction of treatment systems and/or overhead coverage." Furthermore, the media filters proposed for implementation in CEWS' WQBCA Plan dated 3/11/2025 are for NEL violations that occurred in the 2023-2024 reporting year and chosen before any of the lab results were issued for the exceedances that occurred during the 2024-2025 reporting year. Thus, they were intended to remedy prior exceedances before CEWS had any knowledge of the 2024-2025 exceedances, which are

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

significantly higher than the 2023-2024 exceedances. Accordingly, CEWS has failed to design and implement adequate BMPs to reduce or prevent pollutants in the Facility's discharges. CEWS's failure to develop or implement adequate pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the General Permit every day CEWS discharges without meeting BAT/BCT. Each day CEWS failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA (33 U.S.C. § 1311(a)). Consequently, CEWS and its Owners and/or Operators have been in violation of the BAT and BCT requirements at the Facility every day since at least July 11, 2020. As a result, OCW also alleges that CEWS has discharged storm water containing excessive levels of pollutants from the Facility to the receiving water body and its watershed during every local rain event over 0.1 inches over the past five (5) years (see Attachment 1). Each of these rain events represents a discharge of polluted storm water run-off in violation of the CWA and General Permit. CEWS is subject to civil penalties for each of these separate and distinct violations of the CWA and General Permit within the past five (5) years.

125. **Inadequate Storm Water Pollution Prevention Plan:**  Section X of the General Permit states that dischargers shall develop and implement a site- specific SWPPP for their industrial facilities that includes: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

126. Further, Attachment D of the General Permit states that the Site Map shall include the following information: the facility boundary; storm water drainage areas within the facility boundary; portions of any drainage area impacted by discharges from

surrounding areas and flow direction of each drainage area; on-facility surface water bodies; areas of soil erosion; location(s) of nearby water bodies (such as rivers, lakes, wetlands, etc.); location(s) of municipal storm drain inlets that may receive the facility's industrial storm water discharges and authorized Non-Storm Water Discharges (NSWDs); locations of storm water collection and conveyance systems and associated points of discharge, and direction of flow; any structural control measures (that affect industrial storm water discharges authorized NSWDs, and run-on); all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures; locations where materials are directly exposed to precipitation; locations where significant spills or leaks identified have occurred; areas of industrial activity subject to this General Permit; all storage areas and storage tanks; shipping and receiving areas; fueling areas; vehicle and equipment storage/maintenance areas; material handling and processing areas; waste treatment and disposal areas; dust or particulate generating areas; cleaning and material reuse areas; and, any other areas of industrial activity which may have potential pollutant sources.

127.    As explained above, the Facility's SWPPP fails to identify the Facility's driveways as discharge locations and explain whether they are assessed as industrial or non-industrial; fails to state the expected removal rates and treatment flow rates of the filtration devices deployed at the Facility, whether the filtration devices purportedly implemented are capable of treating the sufficient storm water volume or flow rate to comply with the General Permit's design standard relative to the volume of run-off from areas of the Facility they are expected to treat, or how the Facility plans to maximize the contact time of storm water with these devices by reducing the potential for storm water overflow and bypass; fails to mention or describe any filter media at all despite numerous ERAs and WQBCAs referring to filter media; and fails to depict any trench drains despite the Facility's Level 1 ERA Report from 2/5/23 stating trenches would be installed.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

128.    Additional SWPPP deficiencies include, but are not limited to the following: a. Section X.F of the General Permit requires Dischargers to ensure the SWPPP includes a list of industrial materials handled at the facility, and the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency.

i. Page 35 of the Facility's SWPPP refers to "metal powders" and "shredded paper" being "contained and stored out of contact with storm water" but the SWPPP's List of Industrial Materials fails to include these materials.

b. Section X.G.1.a of the General Permit states, "The Discharger shall ensure the SWPPP describes each industrial process including: manufacturing, cleaning, maintenance, recycling, disposal, generation of by products (including, but not limited to, air particulate emissions), and any other activities related to the process. The type, characteristics, and approximate quantity of industrial materials used in or resulting from the process shall be included. Areas protected by containment structures and the corresponding containment capacity shall be identified and described."

i. The Facility's SWPPP fails to adequately describe the generation of byproducts, specifically dust and particulates, from the Facility's industrial processes. For example, the SWPPP refers to metal chips, metal dusts, metal dusts from oxidized and corroded metals, metal powders, and shredded paper which are all associated with dust and particulate generation. The SWPPP's BMP Summary Table associates dust and particulate generation with loading and unloading areas, outdoor scrap metal storage, and storage bins and roll-offs. However,

41

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND  CIVIL PENALTIES

the SWPPP fails to explain how the dismantling, shredding (metals), and compacting (metals) processes identified in the SWPPP generate dust and particulate byproducts. Similarly, the SWPPP refers to the presence of shredded paper but fails to explain if shredding of paper at the Facility produces dust and particulates.

    ii. As a result, the Facility's SWPPP also fails to assess and determine the extent these dust and particulates are exposed to the outdoors as potential pollutants through the Facility building's ventilation system via roof vents/exhausts or roof equipment. The section of the SWPPP entitled "Dust & particulate generating activities" merely assesses the dust and particulates associated with the Facility's industrial activities as follows: "The dust generated from the industrial activities at this facility is associated to the recycling materials received at the facility and ground conditions. It is associated to dust and dirt that the scrap metals are bringing from their originated site." This failure is highlighted by the identification of the building roof as a source of pollutants contributing to the Facility's exceedances in the Facility's WQBCA Plans.

c. Section X.G.1.b of the General Permit states, "The Discharger shall ensure the SWPPP describes each material handling and storage area, including: the type, characteristics, and quantity of industrial materials handled or stored; the shipping, receiving, and loading procedures; the spill or leak prevention and response procedures; and the areas protected by containment structures and the corresponding containment capacity."

    i. The Facility's SWPPP refers to a Dismantling Area in numerous sections and this area is depicted on the Facility's sit map. However, the SWPPP's "List of

42

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Industrial Materials" fails to identify the type, characteristics, and quantity of industrial materials handled or stored in this area. Further, the SWPPP section entitled "Description of Potential Pollutant Sources" fails to include/describe the Dismantling Area as does the SWPPP's BMP Summary Table.

d. Section X.G.1.c of the General Permit states, "The Discharger shall ensure the SWPPP describes all industrial activities that generate a significant amount of dust or particulate that may be deposited within the facility boundaries. The SWPPP shall describe such industrial activities, including the discharge locations, the source type, and the characteristics of the dust or particulate pollutant." As explained above, the SWPPP fails to identify all industrial activities that generate a significant amount of dust or particulate.

e. A SWPPP shall identify and evaluate pollutants that may affect the quality of industrial storm water discharges and authorized non-storm water discharges. (General Permit Section X.C.1.a.). Additionally, Section X.G.2.a of the General Permit requires a SWPPP to include a narrative assessment of all areas of industrial activity with potential industrial pollutant sources. At a minimum, the assessment shall include: the areas of the facility with likely sources of pollutants in industrial storm water discharges and authorized NSWDs; the pollutants likely to be present in industrial storm water discharges and authorized NSWDs; the approximate quantity, physical characteristics (e.g., liquid, powder, solid, etc.), and locations of each industrial material handled, produced, stored, recycled, or disposed; the effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs; the estimated effectiveness of implementing, to the extent feasible, minimum BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs; and, the identification of the industrial pollutants related to the receiving waters with 303(d) listed impairments

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

identified in Appendix 3 or approved TMDLs that may be causing or contributing to an exceedance of a water quality standard in the receiving waters.

i. As explained above, the Facility's SWPPP fails to include a narrative assessment of the dismantling, shredding, and compacting activities identified in the Facility's SWPPP. Therefore, the Facility's SWPPP fails to comply with this requirement to the extent required by the General Permit.

ii. The SWPPP fails to identify the 303(d) listed impairments applicable to the Facility's receiving water body as well as the impaired pollutants applicable to the Facility's HUC-10 Watershed.

iii. Accordingly, the Facility's SWPPP fails to identify and evaluate all pollutants that are likely to be present in and that may affect the quality of the Facility's industrial storm water discharges and authorized non-storm water discharges, especially those associated with impairments that may be cause or contribute to an exceedance of a water quality standard in the Facility's receiving waters.

iv. The Facility also fails to adequately assess the effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs as well as the estimated effectiveness of implementing, to the extent feasible, minimum BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs because the Facility cannot sufficiently make this assessment without properly identifying and assessing all applicable 303(d) and HUC-10 pollutants. Further, as explained above, the Facility has continually failed to implement the requisite minimum BMPs to reduce or prevent pollutants in its industrial storm water discharges as evidenced by the Facility's ongoing exceedances.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

f. Section X.G.2.b requires Dischargers to identify in the SWPPP any areas of the facility where the minimum BMPs described in subsection H.1 will not adequately reduce or prevent pollutants in storm water discharges in compliance with Section V.A. Dischargers shall identify any advanced BMPs, as described in subsection H.2, for those areas. (General Permit Section X.G.2.b). The SWPPP fails to satisfy this requirement. For example, the SWPPP fails to identify and implement roof downspout filters as an advanced BMP for the building's roof despite the Facility's WQBCA Plans identifying the roof as a pollutant source and exceedances continuing at the Facility.

g. Section X.G.2.d requires Dischargers to identify in the SWPPP any additional parameters, beyond the required parameters in Section XI.B.6 that indicate the presence of pollutants in industrial storm water discharges. As explained above, the SWPPP fails to identify and assess for applicable 303(d) and HUC-10 parameters that may be present in the Facility's industrial materials and activities.

h. Section X.E of the General Permit requires Dischargers to prepare a site map that identifies all industrial storage areas and storage tanks, shipping and receiving areas, fueling areas, vehicle and equipment storage/maintenance areas, material handling and processing areas, waste treatment and disposal areas, dust or particulate generating areas, cleaning and material reuse areas, and other areas of industrial activity that may have potential pollutant sources. Additionally, the Discharger shall include storm water drainage areas within the facility boundary. The Facility's site map deficiencies include, but are not limited to:

i. Failure to properly depict storm water flow/discharge from the Facility's driveways (i.e. entrances/exits).

ii. Failure to identify the "Employee Parking Area" as a drainage Area.

45

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

iii. Failure to distinguish industrial from non-industrial areas.

vi.  Failure to identify the shop and maintenance area(s).

vii. Failure to identify the shredder(s) and compactor(s) as dust or particulate generating areas/activities.

viii. Failure to specifically identify the hazardous waste storage area(s).

129.    Section X.B. of the General Permit also requires CEWS to revise its SWPPP whenever necessary and certify and submit its SWPPP to SMARTS within 30 days of any facility changes that require significant SWPPPP revisions(s), and to certify and submit via SMARTS any non- significant revisions not more than once every three (3) months in the reporting year. (General Permit Section X.B). Accordingly, facilities with discharges in violation of the General Permit's Receiving Water Limitations and/or water quality standards must implement additional BMPs or other control measures to achieve compliance with applicable receiving water limitations. The SWPPP must be updated with the additional BMPs that will be implemented to achieve water quality standards, along with an implementation schedule. (General Permit Section I.E). The Facility's SWPPP updates do not include adequate BMPs to achieve applicable water quality standards as demonstrated by the continuing NEL and NAL exceedances.

130.    Moreover, CEWS' most recent SWPPP on SMARTS fails to include many of the BMPs selected for implementation identified in its own certified ERAs and WQBCAs. For example, CEWS' Level 1 ERA Report, dated 2/5/23 states, "Trenches with grills will be placed in the yard to management runoff and sediment. In a near future submergible water pumps may be placed at the discharge points (entrances) to collect and pretreat the storm water runoff before it will be discharged if NALs continua exceedance" and "New Structure BMP (new trenching at the entrances) will be constructed in a future if needed." However, these structural BMPs are not identified in the SWPPP. As such, the Facility has

46

failed to develop and update its SWPPP as required and is in daily violation of the General Permit and CWA.

131.    Every day CEWS fails to develop and implement an adequate SWPPP is a violation of the General Permit. CEWS has been in violation of the General Permit Section X requirements at the Facility every day since at least July 11, 2020.

132.    **Inadequate Monitoring, Reporting, and Compliance Evaluations:** The General Permit requires Facility operators to develop and implement a Monitoring Implementation Program ("MIP"). (General Permit Section X.I). The MIP is required to ensure that the Facility adequately detects and measures its storm water discharges to ensure compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial General Permit. (General Permit Fact Sheet Section II.J(1)). Facility operators must ensure that their MIP practices reduce or prevent pollutants in storm water and authorized non-storm water discharges as well as evaluate and revise their practices to meet changing conditions at the Facility. (General Permit Section I.K(70)). This may include revising the SWPPP as required by General Permit Section I.K(69).

133.    To detect and measure adequately its storm water discharges to ensure compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial General Permit, CEWS is required to visually observe and collect samples of storm water from all locations where storm water is discharged unless an exception applies. (General Permit Section XI.A). This includes collecting at least two (2) samples from each discharge location at the Facility during the first half of the reporting year, and at least two (2) samples from each discharge location during the second half of the reporting year. (General Permit Section XI.B). As explained above, samples are required to be analyzed for SIC code required parameters, additional pollutants present in industrial activities that are potentially exposed to storm water,

47

applicable 303(d) parameters, applicable HUC-10 parameters, and applicable TMDL parameters. As also explained above, the Facility has failed to sufficiently identify and assess applicable 303(d) and HUC-10 parameters, failed to analyze numerous storm water samples for all of the pollutants/parameters identified in its SWPPP, and failed to collect the required number of QSEs for two of the five reporting years applicable to this notice.

134.    CEWS has been operating the Facility with an inadequately developed and/or inadequately implemented MIP, in violation of the substantive and procedural requirements set forth in Section B of the Industrial General Permit. CEWS's monitoring has not resulted in practices at the Facility that adequately reduce or prevent pollutants in storm water as required by Section XI of the General Permit. This is evidenced by the continued exceedances at the Facility since at least the 2020-2021 reporting year. Therefore, CEWS has been in daily and continuous violation of the General Permit's MIP requirements every day since at least July 11, 2020. Every day that CEWS operates with an inadequate MIP is a separate and distinct violation of the General Permit and the CWA. As such, CEWS is subject to civil penalties for all associated violations of the CWA since July 11, 2020.

135.    Section XV of the General Permit requires Dischargers to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling data. This Annual Evaluation must include an assessment of all BMPs for each area of industrial activity and associated potential pollutant sources to determine if the BMPs are properly designed, implemented, and effective in reducing and preventing pollutants in industrial stormwater discharges and authorized NSWDs. The Facility's historical sampling data in the above table indicates the Facility has consistently failed to comply with this requirement. This failure to comply negates a key component of the evaluation process required in self-monitoring programs such as the General Permit,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

and in CEWS's case, has resulted in continued NEL and NAL exceedances. CEWS is in ongoing violation of the General Permit and CWA every day that the Facility operates without evaluating the effectiveness of BMPs and the need for additional BMPs. Each of these violations is a separate and distinct violation of the General Permit and the CWA. CEWS is subject to civil penalties for all violations of the CWA occurring over the past five years.

136. **Failure to Comply with the General Permit's Reporting Obligations:** A Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS. (General Permit Section XVI). The Annual Report requires a Discharger to answer pre-populated compliance assessment questions and explain any instances of non-compliance. A Discharger's responses are certified under penalty of perjury by a Legally Responsible Person (LRP) for the reporting facility (*i.e.* Discharger).

137. The deficiencies and violations detailed within this notice indicate the Facility has failed to accurately report its non-compliance with the General Permit in the Facility's Annual Reports. Additionally, the Annual Reports submitted by the Facility include numerous misrepresentations. For example, every Annual Report submitted during the five-year period applicable to this notice falsely certifies that the Facility has included the applicable HUC-10 pollutants in the SWPPP pollutant source assessment and assessed the need for analytical monitoring for those pollutants. However, the Facility's SWPPP has failed and continues to fail to include these pollutants and/or an assessment during those reporting periods. Furthermore, the Facility's 2019-2020 and 2021-2022 Annual Reports also falsely certify that the Facility sampled the required number of QSEs during those reporting years although the Facility failed to sample the required number of four (4) QSEs during those reporting periods. Therefore, CEWS is in continuous violation of the General Permit. Section XI.B.11.a of the General Permit requires dischargers to submit all sampling

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

and analytical results via SMARTS within 30 days of obtaining all results for each sampling event from the laboratory. The Facility failed to meet this reporting requirement, in violation of the General Permit, for the following sampled rain events: 3/10/2021, 3/15/21, 1/22/24, and 2/1/24.

138.  As explained above, the General Permit requires facilities to submit various ERAs to the SWRCB outlining effective plans to reduce pollutants if a facility experiences an NAL exceedance for a parameter in a given reporting year. The BMPs outlined in these ERAs are expected to eliminate future exceedances. Furthermore, General Permit Section I.C.36 also requires dischargers to submit WQBCA Plans via SMARTS to the Regional Water Board when discharges violate the General Permit's receiving water limitations or water quality standards, such as a TMDL NEL. WQBCA Plans are intended to eliminate parameter exceedances that are especially harmful to impaired water bodies that are sensitive to the pollution those parameters cause.

139.  CEWS has not complied with the ERA or WQBCA Plan reporting requirements in good faith. CEWS has chosen to implement BMPs and control measures that are insufficient to adequately mitigate the NAL and NEL exceedances and violations occurring at the Facility. This is evidenced by the Facility's self-reported sample results continuing to have Zn exceedances of both the NAL and TMDL NEL. The Facility's implementation of inadequate control measures is also highlighted by CEWS's ERA and WQBCA reports/plans repeatedly identifying the same BMP deficiencies and recommendations and the Facility's continued decision not to implement the advanced treatment system recommendations in this reporting.  Furthermore, as also explained above, the Facility's ERA and WQBCA reports/plans fail to explain the expected removal rates and treatment flow rates of the filtration devices deployed at the Facility, whether the filtration devices are capable of treating the sufficient storm water volume or flow rate to comply with the General Permit's design standard relative to the volume of run-off from

50

areas of the Facility they are expected to treat, or how the Facility plans to maximize the contact time of storm water with these devices by reducing the potential for storm water overflow and bypass.

140.   As a result, the Facility has failed to prepare, implement, and report for its ERAs as required by the General Permit. Therefore, the Facility is in violation of the General Permit and the CWA. Each day the Facility operates with inadequate reporting is a separate and distinct violation of the General Permit and CWA. These violations are ongoing and continuous and VST and CEWS are subject to civil penalties for all violations of the CWA occurring over the past 5 years.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Stormwater in Violation of the General Permit's Effluent Limitations and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

141.   Our Clean Oceans incorporates the allegations contained in the above paragraphs as though fully set forth herein.

142.   Our Clean Oceans is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

143.   Our Clean Oceans is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time stormwater discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

the General Permit and the CWA. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

144.    Defendant violates and will continue to violate the General Permit's Effluent Limitations each and every time stormwater containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

145.    Our Clean Oceans is informed and believes, and thereon alleges, that the Defendant's violations of Effluent Limitations of the General Permit and the Clean Water Act are ongoing and continuous.

146.    Each day since at least July 11, 2020 that the Defendant discharges stormwater containing pollutants in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

147.    By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 11, 2020 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

148.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Our Clean Oceans has no plain, speedy, or adequate remedy at law.

149.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendant's Discharges of Contaminated Stormwater in Violation of the General Permit's Receiving Water Limitations and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

150.    Our Clean Oceans incorporates the allegations contained in the above paragraphs as though fully set forth herein.

151.    Our Clean Oceans is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time stormwater discharges from the Facility.

152.    Our Clean Oceans is informed and believes, and thereon alleges, that stormwater containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Facility each time stormwater discharges from the Facility.

153.    The Defendant violates and will continue to violate the General Permit's Receiving Water Limitations each and every time stormwater containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

154.    Our Clean Oceans is informed and believes, and thereon alleges, that the Defendant's violations of Receiving Water Limitations of the General Permit and the CWA are ongoing and continuous.

155.    Each and every violation of the General Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

156.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 11, 2020 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

157.    An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

158.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## **THIRD CAUSE OF ACTION**

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollutant Prevention Plan in Violation of the General Permit and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

159.    Our Clean Oceans incorporates the allegations contained in the above paragraphs as though fully set forth herein.

160.    Our Clean Oceans is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the General Permit.

161.    Our Clean Oceans is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the General Permit.

162.    Our Clean Oceans is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise a SWPPP for the Facility, in violation of the General Permit.

163.    The Defendant has been in violation of the General Permit at the Facility every day from approximately July 11, 2020 to the present.

164.    The Defendant's violations of the General Permit and the CWA at the Facility are ongoing and continuous.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

165.   The Defendant will continue to be in violation of the General Permit and the CWA each and every day the Defendant fails to adequately develop, implement, and/or revise the SWPPP for the Facility.

166.   Each and every violation of the General Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

167.   By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 11, 2020 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

168.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Our Clean Oceans, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

169.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the General and the Clean Water Act. U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

170.   Our Clean Oceans incorporates the allegations contained in the above paragraphs as though fully set forth herein.

171.   Our Clean Oceans is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate M&RP for the Facility, in violation of the General Permit.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

172.    Our Clean Oceans is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an M&RP for the Facility, in violation of the General Permit.

173.    Our Clean Oceans is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an M&RP for the Facility, in violation of the General Permit.

174.    The Defendant has been in violation of the General Permit's monitoring requirements at the Facility every day from July 11, 2020 to the present.

175.    The Defendant's violations of its General Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

176.    The Defendant will continue to be in violation of Section B and Provision E(3) of the 1997 Permit, Section XI of the 2015 Permit, and the CWA each and every day it fails to adequately develop, implement, and/or revise an M&RP for the Facility.

177.    Each and every violation of the General Permit's M&RP requirements at the Facility is a separate and distinct violation of the CWA.

178.    By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 11, 2020 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

179.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Our Clean Oceans, its members, and the citizens of California, for which harm they have no plain, speedy, or adequate remedy at law.

180.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

### FIFTH CAUSE OF ACTION

**Defendant's Failure to Report as Required by the General Permit in Violation of the
General Permit and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and
1365(f)**

181.    Plaintiff incorporates the allegations contained in the above paragraphs as
though fully set forth herein.

182.    Section XI(B)(2) of the 2015 Permit requires a discharger to collect and
analyze stormwater samples from two (2) QSEs within the first half of each reporting year
(July 1 to December 31), and two (2) QSEs within the second half of each reporting year
(January 1 to June 30). Dischargers are required to submit the stormwater sample analyses
to the State Board and Regional Board.

183.    Section XI(B)(6) of the 2015 Permit requires dischargers to analyze
stormwater samples for TSS, O&G, pH, additional parameters identified by the discharger
on a facility-specific basis that serve as indicators of the presence of all industrial pollutants
identified in the pollutant source assessment, additional applicable industrial parameters
related to receiving waters with 303(d) listed impairments or approved TMDLs, and
additional parameters required by the Regional Board.

184.    Section XVI of the 2015 Permit requires a discharger to certify and submit via
SMARTS an Annual Report no later than July 15th following each reporting year using
the standardized format and checklists in SMARTS and include: 1) a compliance checklist
that indicates whether a discharger complies with, and has addressed all applicable
requirements of this General Permit; 2) an explanation for any non-compliance of
requirements within the reporting year, as indicated in the compliance checklist; and an
identification, including page numbers and/or sections, of all revisions made to the SWPPP
within the reporting year.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

185.   Section XII(C) of the 2015 Permit requires a discharger to execute a Level 1 Exceedance Response Actions ("ERA") Evaluation and prepare a Level 1 ERA Report should they exceed a Numeric Action Level ("NAL") for any required sampling and analysis parameter under the 2015 Permit, or a Level 2 ERA and prepare a Level 2 ERA Report should they exceed a NAL for two consecutive two consecutive reporting years, for any required sampling and analysis parameter under the 2015 Permit The ERA Evaluation should identify additional BMPs and SWPPP revisions needed to prevent future NAL exceedances and comply with the 2015 Permit. Based upon the ERA Evaluation(s), the discharger shall as soon as practicable, but not later than January 1, shall submit an ERA Report and certify that the ERA Report includes: 1) a summary of the ERA Evaluation, 2) a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. Level 2 ERA reports require more stringent requirements than a Level 1 ERA report.

186.   Our Clean Oceans is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed and continue to fail to sample and analyze stormwater in any reporting year under a claim that there were insufficient qualifying storm events during operating hours. *See* Exhibit A and exhibit to same.

187.   Our Clean Oceans is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections XI and XVI of the 2015 Permit.

188.   Our Clean Oceans is informed and believes, and thereon alleges, that the Facility Owners/Operators failed and continue to fail to submit ERA Reports to the Regional Board that implement BMPs and control measures sufficient to adequately mitigate the exceedances and violations occurring at the Facility in violation of Section XII(C-D) of the 2015 Permit. Therefore, there is a high likelihood that the Facility's

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND  CIVIL PENALTIES

stormwater discharges will continue to discharge pollutants at levels harmful to water quality.

189.   Our Clean Oceans is informed and believes, and thereon alleges, that the Facility Owners'/Operators' Annual Reports failed and continue to fail to meet the monitoring and reporting requirements of the General Permit, in violation of Section B(14) of the 1997 Permit and Sections XI and XVI of the 2015 Permit.

190.   Our Clean Oceans is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have failed and continue to fail to submit complete Annual Reports to the Regional Board, in violation of Sections XI and XVI of the 2015 Permit.

191.   The Facility Owners/Operators have likely been in violation of Sections XI, XII and XVI of the 2015 Permit since mid 2015.

192.   The Facility Owners/Operators have been in violation of the reporting requirements of the General Permit each day it has operated the Facility without reporting as required by Receiving Water Limitations C(3) and C(4) of the 1997 Permit, and Sections XI, XII(C) and XVI of the 2015 Permit.

193.   The Defendant has been in violation of Sections XI, XII(C) and XVI of the 2015 Permit since at least July 11, 2020.

194.   The Defendant's violations of the reporting requirements of the 2015 Permit and the CWA are ongoing and continuous.

195.   By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 11, 2020 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

196.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES

alleged above would irreparably harm Our Clean Oceans, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

197.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a. A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the General Permit and the CWA.

b. A Court order enjoining Defendant from violating the substantive and procedural requirements of the General Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c. A Court order assessing civil monetary penalties for each violation of the CWA occurring prior to the relevant period at $37,500 per day, per violation, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

d. A Court order assessing civil monetary penalties for each violation of the CWA occurring during the relevant period described herein subjects Defendant to a penalty of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND  CIVIL PENALTIES

up to $53,484 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2016);

e. A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f. Any other relief as this Court may deem appropriate.

Respectfully submitted,

DATED:  October 13, 2025          **ACTIUM LLP**

By:   /s/ *Mike Gatto*
MIKE GATTO
Actium LLP

Attorneys for Plaintiff Our Clean Oceans Inc.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND  CIVIL PENALTIES



**EXHIBIT A**

July 11, 2025

## VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED

| | |
|---|---|
| John Kim<br>Director of EHS<br>Corporate eWaste Solutions<br>331 Cliffwood Park Street<br>Brea, CA 92821 | Chun Yu Eric Chu<br>Registered Agent for Corporate eWaste Solutions<br>Corporate eWaste Solutions<br>331 Cliffwood Park Street<br>Brea, CA 92821 |
| Yi Jung Chiu<br>Yard Supervisor<br>Corporate eWaste Solutions<br>331 Cliffwood Park Street<br>Brea, CA 92821 | Chun Yu Eric Chu<br>CEO<br>Corporate eWaste Solutions<br>331 Cliffwood Park Street<br>Brea, CA 92821 |

**Re:    Notice of Violations and Intent to File Suit under the Clean Water Act**

To Whom It May Concern:

This letter is sent on behalf of Our Clean Oceans ("OCO") regarding violations of the Clean Water Act ("CWA") and California's General Industrial Storm Water Permit ("General Permit") occurring at Corporate eWaste Solutions ("CEWS") located at 331 Cliffwood Park Street, Brea, CA 92821 (the "Facility"). The purpose of this letter is to put CEWS, John Kim, Yi Jung Chiu, and Eric Chu, collectively the "Owners and/or Operators" of the Facility, on notice of the violations occurring at the Facility and that OCO intends to file suit against CEWS for these violations pursuant to the CWA and General Permit. As explained herein, CEWS and its Owners and/or Operators are liable for violations of the General Permit that include, but are not limited to, non-compliant discharges of polluted storm water associated with industrial activities into local surface waters.

OCO is a nonprofit 501(c)(3) public benefit corporation organized under the laws of California with an office located in Newport Beach, CA. OCO's members live, work, and recreate within the Orange County areas. OCO is dedicated to the preservation, protection, and defense of the inland and coastal waters of Orange County, including the Coyote Creek (the "Receiving Water"), its tributaries, and the Pacific Ocean. To further this mission, OCO actively seeks federal and state implementation of the CWA. Where necessary, OCO directly initiates enforcement actions on behalf of itself and its members.

Members of OCO work, live, and recreate in Orange County where they use and/or enjoy the Coyote Creek (the "Receiving Water"), its tributaries, and the Pacific Ocean, as well as the bordering pathways, parks, fields, and beaches. OCO members also use and enjoy these waterways to bike, kayak, birdwatch, view wildlife, hike, walk, run, fish, surf, swim, and otherwise recreate. As explained in this notice letter, the ongoing and continuous unlawful

**CORPORATE HEADQUARTERS**

2618 SAN MIGUEL, SUITE 1885
NEWPORT BEACH CA 92660

833.241.8799
OURCLEANOCEANS.ORG

**REGIONAL OFFICES**

8549 WILSHIRE BLVD #2121
BEVERLY HILLS, CA 90211

945 TARAVAL ST #1033
SAN FRANCISCO, CA 94116

4020 CHICAGO AVE #1050
RIVERSIDE, CA 92507

248 3RD ST #1395
OAKLAND, CA 94607

22999 KENDALL DR PMB 1012 # 204
SAN BERNARDINO, CA 92407

4231 BALBOA AVENUE #1071
SAN DIEGO, CA 92117

1

Notice of Violations and Intent to File Suit
CEWS

discharge of pollutants from the Facility into this watershed impairs OCO members' use and enjoyment of these waters and requires OCO to expend its limited resources to combat pollution from the facility. Consequently, the interests of OCO and its members have been, are being, and will continue to be adversely affected by CEWS's failure to comply with the CWA and the General Permit.

CEWS is in ongoing and continuous violation of the substantive and procedural requirements of the CWA, 33 U.S.C. § 1251 et seq. and California's General Permit, pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, Water Quality Order No. 2014-0057-DWQ as amended by Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; (2) Total Maximum Daily Load ("TMDL") Implementation Requirements; and (3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by Order No. 2018-0028-DWQ incorporating TMDL effluent limits (effective July 1, 2020)(collectively "General Permit").[1]

Pursuant to CWA Section 309(d) (33 U.S.C. § 1319(d)) and the Adjustment for Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA subjects CEWS to a penalty of up to $66,712 per day per violation, for all violations occurring during the period commencing five (5) years prior to the date of this Notice of Violations and Intent to File Suit. In addition to civil penalties, OCO intends to seek injunctive relief preventing further violations of the CWA pursuant to Sections 505(a) and (d) (33 U.S.C. §§ 1365(a) and (d)) and such other relief as permitted by law. Further, Section 505(d) of the CWA (33 U.S.C. § 1365(d)) permits OCO to recover costs and fees, including attorneys' fees.

Section 505(b) of the CWA (33 U.S.C. § 1365(b)) requires that sixty (60) days prior to the initiation of a civil action under CWA Section 505(a) (33 U.S.C. § 1365(a)), a citizen-enforcer must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the Chief Administrative Officer of the of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. § 135.2. As required by the CWA, this letter provides statutory notice of the violations that have occurred, and continue to occur at the Facility. (40 C.F.R. § 135.3(a)). At the expiration of sixty (60) days from the date of this letter, OCO intends to file suit under CWA Section 505(a) in federal court against CEWS for violations of the CWA and the General Permit.

# I. BACKGROUND

## A. The Clean Water Act

Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." (33 U.S.C. § 1251). The CWA prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002). The CWA is administered largely through the NPDES permit program. (33 U.S.C. § 1342). In 1987, the CWA was amended to establish a framework for regulating storm water discharges through

---

[1] CEWS most recently submitted a Notice of Intent (NOI) to comply with the General Permit for the Facility on or about January 16, 2020.


OUR CLEAN OCEANS · PROTECT & PRESERVE    OURCLEANOCEANS.ORG    2

Notice of Violations and Intent to File Suit
CEWS

the NPDES system.  Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987)
(codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41
(9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water
Act's permitting scheme). The discharge of pollutants without an NPDES permit, or in violation
of a NPDES permit, is illegal. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141,
1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been
delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing
California's intent to implement its own NPDES permit program). The CWA authorizes states
with approved NPDES permit programs to regulate industrial storm water discharges through
individual permits issued to dischargers, as well as through the issuance of a single, statewide
general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342(b)).
Pursuant to Section 402 of the CWA, the Administrator of the EPA has authorized California's
State Water Resource Control Board ("SWRCB") to issue individual and general NPDES
permits in California. (33 U.S.C. § 1342). The SWRCB coordinates with the Santa Ana Regional
Water Quality Control Board ("Regional Board"), which has shared jurisdiction over the Facility
for state and federal water pollution control efforts.

**B. California's General Permit for Storm Water Discharges Associated with Industrial
Activities**

Facilities discharging, or having the potential to discharge, storm water associated with
industrial activities that have not obtained an individual NPDES permit must apply for coverage
under the General Permit by filing a Notice of Intent (NOI) with Regional Board. (General
Permit Sections XXI.A and I.A.12).  Facilities must file their NOIs before the initiation of
industrial operations. *Id.*

Facilities must strictly comply with all terms and conditions of the General Permit.  A
violation of the General Permit is a violation of the CWA.  (General Permit Section XXI.A).
The General Permit contains three primary and interrelated categories of requirements: (1)
discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water
Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting
requirements.

Under the current General Permit, facilities must submit various Exceedance Response
Action plans ("ERAs") to the SWRCB outlining effective Best Management Practices (BMPs) to
reduce pollutants if a facility discharges a pollutant above its Numeric Action Level ("NAL").
An annual NAL exceedance occurs when the average of all the analytical results for a parameter
from samples taken within a reporting year[2] exceeds the annual NAL value for that parameter.
An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results
from samples taken for Total Suspended Solids ("TSS") or Oil & Grease ("O&G") within a
reporting year exceed the instantaneous maximum NAL value or pH is outside of the
instantaneous maximum NAL range for two (2) or more analytical results.  (General Permit
Section XII.A).

---

[2] Under the General Permit, a reporting year is defined as July 1 to June 30.



3

ERAs consist of two (2) levels, Level 1 and Level 2.  If a facility enters Level 1 for an exceedance of a parameter in a reporting year, that facility is required to submit a Level 1 ERA Report to the SWRCB via SMARTS, that sufficiently mitigates the polluted discharges and is prepared by a Qualified Industrial Storm Water Practitioner ("QISP").  If an exceedance of a Level 1 parameter occurs again in a subsequent reporting year before a facility returns to Baseline Status for that parameter, the facility is also required to submit a Level 2 ERA Action Plan to the SWRCB via SMARTS, that sufficiently mitigates the polluted discharges and is prepared by a QISP.  A facility that enters Level 2 is also required to submit a QISP prepared Level 2 ERA Technical Report via SMARTS that assesses the effectiveness of the Level 2 ERA Action Plan BMPs in eliminating the relevant exceedances and polluted discharges.

The current General Permit also contains requirements that are specific to Total Maximum Daily Loads ("TMDLs") for watersheds and water bodies with U.S. EPA-approved and U.S. EPA-established TMDLs for facilities covered by the General Permit.  TMDLs establish the maximum amount of a pollutant that a water body can receive and still achieve water quality standards.  Facilities located within a watershed subject to a TMDL(s) shall comply with any applicable TMDL specific permit requirements as set forth within Attachment E of the General Permit.  These requirements include submitting Water Quality Based Corrective Action (WQBCA) Plans to the SWRCB via SMARTS which require dischargers to identify, develop, and implement BMPs sufficient to eliminate any TMDL exceedances.

## C.  CEWS's Permitted Industrial Facility

The Facility is located at 331 Cliffwood Park Street, Brea, CA 92821, and conducts industrial activities that are subject to the General Permit.  The Facility's NOI lists its Standard Industrial Classification ("SIC") code as 5093 (Scrap and Waste Materials), which requires General Permit coverage.

The Facility's Waste Discharge Identification (WDID) number is 8 30I028501, and the Facility's NOI and SWPPP state the site comprises 182,952 square feet, 100% of which is impervious, with 36,590 square feet exposed to storm water.  CEWS is an e-waste recycler that separates materials into commodity units such as plastic, metals, and glass through various processing technologies.  CEWS handles all e-waste and plastic stream lifecycle needs, creating customized solutions for difficult and complex scrap.

According to the Facility's most recent SWPPP on SMARTS, dated 2/2/2023, industrial activities conducted at the Facility include, but are not limited to: dismantling, metals sorting and separation, material storage and handling (including electronic devices, cathode-ray tubes, appliances, plastics, cardboard, and used pallets), loading and unloading, vehicle/forklift traffic, equipment maintenance, and storage of hazardous materials and wastes such as electronic components, batteries, used oils and grease, used absorbent, contaminated soil, and wastes from hazardous spill cleanups.

Information available to OCO indicates that CEWS conducts industrial activities both indoors and outdoors and that its indoor industrial activities have exposure to the outdoors. Industrial materials are handled and stored at various locations throughout the facility, either



Notice of Violations and Intent to File Suit
CEWS

outdoors without adequate cover to prevent storm water exposure and/or without adequate BMPs to prevent tracking to the outdoors, and without adequate treatment measures to prevent polluted storm water and non-storm water from discharging the facility. Many pollutants associated with industrial activities occurring indoors or under partial cover regularly escape to the outdoors via wind dispersion, track out, or otherwise, resulting in pollutant dispersal throughout the facility, and off the facility through ingress and egress and rain events.

For example, the Facility's most recent SWPPP identifies oil and grease from metals, metal liquid wastes, assorted/mixed waste fluids, oily soil, solvents, acids, metal dusts, metal powders, and metal chips as pollutant sources. These types of pollutants are easily tracked outdoors by foot and forklift traffic. Accordingly, the SWPPP states "The indoor storage area is concrete paved but tracking out of pollutants is a concern," and "The indoor bins are pollutants source by tracking out pollutants and when they are unloading them into the containers." Additionally, the metal chips, metal dusts, metal dusts from oxidized and corroded metals, metal powders, and shredded paper, identified in the Facility's SWPPP as associated with the Facility's industrial activities, are prone to outdoor exposure via aerial dispersion/deposition and track out through building roof vents and/or exhausts. Moreover, sources available to OCO indicate the typical dust and particulate generating industrial activities associated with the Facility's recycling operations as dismantling, shredding (metal), compacting (metal), and melting/burning. Notably, the Facility's building roof is equipped with a significant amount of unidentified appurtenances and equipment, with some appearing to be roof vents and/or exhausts which are a dispersion source of pollutants from indoor industrial activities to the outdoors through the Facility's building ventilation system. This is evidenced by the dark staining at numerous locations along the northern portion of the Facility's building roof, indicating accumulation of pollutants from indoor industrial activities to the outdoor roof surfaces. This is further evidenced by the Facility's WQBCA Plans, dated 12/16/2023 and 3/11/2025, which both identify "[t]he discharge of storm water runoff from rooftop to the site" as a potential source contributing to the NEL exceedances occurring at the Facility. Thus, OCO believes the Facility has more square footage exposed to storm water than stated in its NOI and SWPPP because of industrial related particulates accumulating on its roof surfaces.

In addition to the tracking of pollutants from the Facility's indoor industrial activities to the outdoors, the Facility's historical ERA and WQBCA reporting repeatedly identifies CEWS' exposed outdoor industrial activities as sources of the ongoing exceedances at the Facility as well. For example, the Facility's Level 1 ERA Report from December 2021 identifies metal particles on ground surfaces and uncovered roll-off bins containing metal particles as sources of the Total Suspended Solids (TSS), Iron (Fe), and Aluminum (Al) exceedances at CEWS. The Facility's WQBCA Plan from December 2023 recognizes electrical waste with copper components, dust from vehicle brake shoes, spills of vehicle waste oils, and copper components from oxidized old metal parts as sources of the Facility's Copper (Cu) exceedances. Similarly, the Facility's Level 1 ERA Report from February 2023 identifies metals and electrical motors with copper components, spills of waste with copper components, and oxidized old metal parts with copper components as sources of the Copper (Cu) exceedances. The Facility's WQBCA Plan from March 2025 identifies electrical waste with Zinc (Zn) components and an exposed scrap bin as contributing to the Zn exceedances. Notably, the above-mentioned plans and reports consistently state the same or extremely similar source control deficiencies while also continually identifying lack of BMP implementation at the site and poor housekeeping and



Notice of Violations and Intent to File Suit
CEWS

management as reasons for these deficiencies. This demonstrates the Facility's continued failure to address the recognized deficiencies contributing to its exceedances. Based on information within the Facility's SWPPP, CEWS's industrial activities generate potential pollutants including, but not limited to: pH, Oil & Grease (O&G), TSS, Fe, Al, Zn, Cu, Lead (Pb), Cadmium (Cd), Nickel (Ni), Selenium (Se), Chromium (Cr), and Chemical Oxygen Demand (COD). However further investigation into the Facility's material Safety Data Sheets (SDSs), industrial activities, and waste byproducts is likely to result in the discovery of additional pollutants. As an example, the wooden pallets and associated wood debris, cardboard, and shredded paper present at the Facility are sources of Dissolved Oxygen (DO) which the Facility's watershed is impaired for.

The Facility is required to analyze for pH, TSS, O&G, Fe, Pb, Al, Zn, and COD pursuant to its SIC Code. Facilities must also sample and analyze additional parameters identified on a facility specific basis based on pollutant source assessments, receiving water impairments, or as otherwise required by the Regional Board. (General Permit Section XI.B.6). Pursuant to Clean Water Act Section 303(d)'s list of impaired waterbodies, the Coyote Creek is impaired for Ammonia (NH3), Diazinon, E. Coli, Enterococcus, Dissolved Cu, Pb, and pH. Pursuant to the SWRCB's applicable HUC-10 watershed (Lower San Gabriel River), the Facility's watershed is impaired for NH3, Cyanide (CN), Diazinon, Dioxin, DO, E. Coli, Enterococcus, Coliform Bacteria, Se, Pb, Cu, Dissolved Cu, Ni, Nitrate, Nitrite, Total Nitrogen, Phosphorous (P), PCBs, Chlordane, and pH. Additionally, the facility is subject to the San Gabriel River Metals and Selenium TMDL (Coyote Creek and/or its Tributary/Tributaries) which consists of Cu, Pb, and Zn.

The Facility's self-reported sampling results indicate exceedances of numerous parameters, including the applicable TMDL Numeric Effluent Limitations (NELs) for Cu and Zn. An exceedance of an NEL is a violation of the General Permit. (General Permit Attachment C). Violations of the General Permit are violations of the CWA. Storm water from the Facility discharges via the local storm sewer system and/or surface runoff indirectly into the aforementioned receiving waters. Consequently, these illegal discharges of polluted storm water impact OCO's members use and enjoyment of the Facility's receiving waters by contributing to the degradation of these already impaired surface waters, and by posing risks to human well-being, aquatic life, and ecosystem health.

## II.  CEWS's VIOLATIONS OF THE CWA AND THE GENERAL PERMIT

Any person or facility discharging storm water associated with industrial activity must comply with the General Permit. (See 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1); General Permit Fact Sheet at VII). Moreover, pursuant to Section I.A.8 of the General Permit, a facility operator must "comply with all requirements, provisions, limitations, and prohibitions in this General Permit." Failure to comply with the Industrial General Permit is a Clean Water Act violation. (Industrial General Permit Section XXI.A). As an enrollee, CEWS has a duty to comply with the Industrial General Permit and is subject to all of the provisions therein.

Based on OCO's review of available public documents, primarily from SMARTS, OCO is informed and believes that CEWS is in ongoing and continuous violation of both the substantive and procedural requirements of the CWA and the General Permit at the Facility. Consistent with



Notice of Violations and Intent to File Suit
CEWS

the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the CWA, CEWS and its Owners and/or Operators are subject to penalties for these violations of the CWA since at least July 11, 2020.

## A. Discharges of Polluted Storm Water from the Facility in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations

CEWS's storm water sampling results provide conclusive evidence of its failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations. Self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

### 1. Applicable Water Quality Standards

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. (General Permit Section III.C.) The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Board Basin Plan or other statewide water quality requirements. (General Permit Section III.D.) Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment and shall not cause or contribute to a violation of any water quality-based effluent limitation. (General Permit Sections VI.A, VI.B.) Upon determination that storm water discharges from a discharger are causing or contributing to an exceedance of water quality standards, a discharger is required to conduct a facility evaluation, identify pollutant sources, and prepare and submit documentation to the Regional Board stating which BMPs and SWPPP implementation measures are necessary to reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. (General Permit XX.B).

The California Toxics Rule ("CTR") is an applicable water quality standard under the Permit, the violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015). The CTR establishes numeric receiving water limits for toxic pollutants in California surface waters. (40 C.F.R. § 131.38.) As such, the CTR has established a numeric limit for the following pollutants alleged to be discharged by the Facility: Copper (0.013 mg/L), Zinc (0.12 mg/L), Cadmium (0.0043 mg/L), Lead (0.065 mg/L), Nickel (0.470 mg/L, Chromium III (0.550 mg/L), and Chromium VI (0.016 mg/L).

The Water Quality Control Plan for the Santa Ana Region ("Basin Plan") also sets forth water quality standards and prohibitions applicable to CEWS's storm water discharges. The Basin Plan includes a narrative toxicity standard which states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." (Santa Ana Region Basin Plan). Further, "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses." *Id.* Additionally, the Basin Plan's Water Quality Standards also require a lesser pH range of 6.5 –



Notice of Violations and Intent to File Suit
CEWS

8.5 pH units than the General Permit for inland surface waters such as the Coyote Creek and its watershed. *Id*.

### 2. Applicable Effluent Limitations

The Effluent Limitations of the Industrial General Permit prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants[3] and best conventional pollutant control technology ("BCT") for conventional pollutants. (General Permit Section I.D). Specifically, the Permit "requires control of pollutant discharges using BAT and BCT to reduce and prevent discharges of pollutants, and any more stringent effluent limitations necessary for receiving waters to meet applicable water quality standards." *Id*. Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand, and fecal coliform. (40 C.F.R. § 401.16). All other pollutants are either toxic or nonconventional. *Id.*; 40 C.F.R. § 401.15.

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. *Santa Monica Baykeeper v. Kramer Metals*, 619 F.Supp.2d 914, 920, 923 (C.D. Cal. 2009); General Permit Section XII.A. These benchmark levels are reflected as NAL values in the General Permit. (See below for applicable NAL Values). A discharger that exceeds an NAL must comply with the ERA requirements in Section XII of the General Permit.

The General Permit also requires a permittee whose discharges violate the General Permit's Receiving Water Limitations or water quality standards, such as TMDL NELs and CTR limits to implement additional BMPs to attain compliance with the receiving water limitation or standard. A Discharger that is notified by a Regional Board or who determines its discharge is causing or contributing to an exceedance of a water quality standard must comply with the water quality based corrective actions in Section XX.B of the General Permit.

### 3. The Facility's Storm Water Sample Results

Section XI.B.4 of the General Permit requires samples to be representative of storm water associated with industrial activities at a facility and collected from each drainage area at all discharge locations unless an exception in section XI.C.4 of the General Permit is applicable. The requirement of representative storm water sampling includes collecting samples from the appropriate discharge locations representative of industrial activities and ensuring that the measurements taken for the purpose of monitoring be representative of those monitored activities. (General Permit Section XXI.J.1).

The site map from the Facility's most recent SWPPP on SMARTS illustrates two (2) sampling locations but fails to name them for identification purposes. Pages 55 and 57 of the Facility's SWPPP merely state, "Two storm water discharge points have been identified for this Facility" and "Two storm water discharge points were observed at this facility." Thus, the SWPPP fails to provide a narrative explanation of where these discharge points are located and

---

[3] BAT is defined at 40 CF.R. § 437.1 et seq. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.



Notice of Violations and Intent to File Suit
CEWS

also fails to identify them by name. Moreover, the Facility's chain of custodies and sample results only identify these discharge/sample points as DP1 and DP2. As a result, the Facility's documentation provides no means for associating DP1 and DP2 with their corresponding physical locations on the Facility's site map or for associating the Facility's sample results with their corresponding physical locations.

Furthermore, information available to OCO indicates that the Facility's assessment of its discharge and sampling locations is inaccurate. For example, there appears to be a storm drain at the northwest corner of the Facility, slightly south of the northwest driveway, that is not depicted on the Facility's site map(s) or otherwise identified in the Facility's SWPPP. The Facility's SWPPP and site map also fail to provide information related to the Facility's drainage infrastructure or the identified discharge/sample locations that would account for this undepicted storm drain. Notably, the site map illustrates that storm water associated with outdoor material storage areas and a portable loading and unloading area would flow towards the location of this undepicted storm drain. If the Facility has determined that one of its identified discharge/sample locations is representative of the storm water associated with the undepicted storm drain, this type of representative sampling reduction requires specific documentation within the Facility's SWPPP. Pursuant to section XI.C.4 of the General Permit, a representative sampling reduction requires the following: Identification and description of each drainage area and corresponding discharge location(s); A description of the industrial activities that occur throughout the drainage area; A description of the BMPs implemented in the drainage area; A description of the physical characteristics of the drainage area; A rationale that demonstrates that the industrial activities and physical characteristics of the drainage area(s) are substantially similar; and, An identification of the discharge location(s) selected for representative sampling, and rationale demonstrating that the selected location(s) to be sampled are representative of the discharge from the entire drainage area. However, the Facility's SWPPP does not contain this requisite information. Therefore, without a Facility inspection, OCO is unable to ascertain whether CEWS is sampling from properly selected locations that represent the true character of industrial storm water discharging the Facility.

Additional information available to OCO further demonstrates the Facility's inaccurate assessment of its industrial storm water drainage, discharge locations, and potentially required sample locations. For example, the area labeled "Employee Parking Area" on the Facility's site map is not identified as included in Drainage Area 1 or 2, or as its own drainage area. Consequently, the site map fails to indicate whether this area has been assessed as non-industrial or industrial, which is an inadequate characterization of the Facility's drainage areas. This failure is magnified by the the industrial material storage areas and portable loading dock located within the employee "Employee Parking Area" and the undepicted storm drain that some storm water from this area would flow to. Moreover, the site map illustrates storm water flowing from the two (2) driveways at the "Employee Parking Area" towards the Facility rather than away from it, although all driveways are made to slope downwards directing sheet flow away from facilities. Notably, the Facility's own Level 1 ERA Report from December 2021 contradicts the site map by stating, "media filter socks will be implemented across the entrance gates." Collectively, this information indicates that storm water does discharge from the driveways (i.e. entrance gates) at the "Employee Parking Area" and that they are not appropriately identified as discharge locations or assessed as potentially required sample locations. Furthermore, the site map depicts storm water from the western portion of the Facility flowing southward while



Notice of Violations and Intent to File Suit
CEWS

depicting storm water from the eastern portion of the Facility flowing northward.  Contrasting flow directions of this nature at a Facility with relatively flat topography is extremely unlikely without drainage conveyances facilitating such inconsistent flow direction(s).  However, the Facility's site map and SWPPP both fail to depict and/or explain any conveyances directing storm water in this manner.  Also, the sample location in the northeast is not identified as a storm drain and the Facility's SWPPP fails to explain how storm water discharges from this location, or how it is the only discharge point along the entire eastern perimeter.  Accordingly, these examples demonstrate additional inaccuracies that prevent OCO from determining whether CEWS' sampling is representative of all industrial activity at the Facility.

Additionally, the Facility has an extensive history of failing to analyze its storm water samples for all of the parameters its SWPPP identifies as required by the General Permit.  The Facility's SWPPP states, "The pollutants likely to be present in the industrial storm water runoff from this facility are oil and grease, metals like iron, aluminum, zinc, chromium, copper, lead, cadmium, acid/basic substances, and nickel, as well as total suspended solid and total dissolve solid."  Despite this, the Facility's SWPPP does not identify Ni and Cr as required for analysis, and the Facility has failed to analyze its storm water discharge for Ni and Cr during the five (5) year period applicable to this notice.  The SWPPP does identify Cu, Cd, and Se as required for analysis in the table on Pages 59-60, and the BMP Summary Table in the SWPPP repeatedly identifies Cu and Cd as industrial pollutants.  However, the Facility failed to analyze Cu for the samples collected on 3/10/2020 and 3/15/2021; failed to analyze Cd for the samples collected on 3/10/2020, 3/10/2021, 3/15/2021, 12/14/21, 12/23/21, and 11/8/22; and has failed to analyze for Se during the five (5) year period applicable to this notice.  As a result, the Facility has been in violation of the General Permit since at least 3/10/2020.

OCO further alleges that additional NAL exceedances would have been reported had the Facility sampled four (4) times per reporting year as required by General Permit Section XI.B(2).  The Facility only sampled two (2) times during the 2020-2021 and 2021-2022 reporting periods and failed to sample in the first half of the storm water year (July 1 - December 31) during the 2020-2021, 2023-2024, and 2024-2025 reporting years as required.  These failures to collect and analyze the requisite amount of storm water samples took place although qualifying storm events (QSEs) occurred during these periods (see **Attachment 1**).  Consequently, the Facility's sample results in the below table do not reflect the true volume of parameter exceedances occurring at the Facility.  Additional exceedances would have been reported had the Facility sampled the requisite number of times per reporting year for all potential pollutants as required by General Permit.

The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations, and effluent limitations of the General Permit.

    **a. Discharges of Storm Water from the Facility at Concentrations in Excess of the NALs, CTR Values, TMDL NELs, and/or Basin Plan Values.**



Notice of Violations and Intent to File Suit
CEWS

| Date of Sample | Discharge Point | Parameter | Result | NAL Value | NEL Value |
|---|---|---|---|---|---|
| 3/10/21 | DP2 | Iron | 1.04 mg/L | 1.0 mg/L | - |
| 3/15/21 | DP1 | Iron | 1.89 mg/L | 1.0 mg/L | - |
| 2/24/23 | DP1 | Iron | 1.1 mg/L | 1.0 mg/L | - |
| 2/24/23 | DP2 | Iron | 1.12 mg/L | 1.0 mg/L | - |
| 3/29/23 | DP1 | Iron | 2.67 mg/L | 1.0 mg/L | - |
| 3/29/23 | DP2 | Iron | 1.33 mg/L | 1.0 mg/L | - |
| 1/3/24 | DP1 | Iron | 1.19 mg/L | 1.0 mg/L | - |
| 3/12/25 | DP2 | Iron | 1.55 mg/L | 1.0 mg/L | - |
| 3/10/21 | DP2 | Aluminum | .82 mg/L | .75 mg/L | - |
| 3/15/21 | DP1 | Aluminum | 1.5 mg/L | .75 mg/L | - |
| 3/15/21 | DP2 | Aluminum | .85 mg/L | .75 mg/L | - |
| 2/24/23 | DP1 | Aluminum | .812 mg/L | .75 mg/L | - |
| 2/24/23 | DP2 | Aluminum | 1.76 mg/L | .75 mg/L | - |
| 3/29/23 | DP1 | Aluminum | 2.98 mg/L | .75 mg/L | - |
| 3/29/23 | DP2 | Aluminum | .86 mg/L | .75 mg/L | - |
| 2/19/24 | DP1 | Aluminum | 1.24 mg/L | .75 mg/L | - |
| 3/12/25 | DP2 | Aluminum | 4.58 mg/L | .75 mg/L | - |
| 3/10/21 | DP2 | Total Suspended Solids | 268 mg/L | 100 mg/L | - |
| 3/15/21 | DP1 | Total Suspended Solids | 126 mg/L | 100 mg/L | - |
| 3/12/25 | DP2 | Total Suspended Solids | 132 mg/L | 100 mg/L | - |
| 12/14/21 | DP1 | Copper | .18 mg/L | .0332 mg/L | .027 mg/L |
| 12/14/21 | DP2 | Copper | .17 mg/L | .0332 mg/L | .027 mg/L |
| 12/23/21 | DP2 | Copper | .088 mg/L | .0332 mg/L | .027 mg/L |
| 12/30/22 | DP1 | Zinc | .25 mg/L | .26 mg/L | .158 mg/L |
| 12/30/22 | DP2 | Zinc | .25 mg/L | .26 mg/L | .158 mg/L |
| 1/3/24 | DP1 | Zinc | .282 mg/L | .26 mg/L | .158 mg/L |
| 1/3/24 | DP2 | Zinc | .255 mg/L | .26 mg/L | .158 mg/L |
| 1/22/24 | DP1 | Zinc | .194 mg/L | .26 mg/L | .158 mg/L |
| 2/1/24 | DP1 | Zinc | .207 mg/L | .26 mg/L | .158 mg/L |
| 2/19/24 | DP1 | Zinc | .398 mg/L | .26 mg/L | .158 mg/L |
| 2/6/25 | DP1 | Zinc | .60 mg/L | .26 mg/L | .158 mg/L |
| 2/13/25 | DP2 | Zinc | .166 mg/L | .26 mg/L | .158 mg/L |
| 3/5/25 | DP1 | Zinc | .93 mg/L | .26 mg/L | .158 mg/L |
| 3/12/25 | DP2 | Zinc | 1.66 mg/L | .26 mg/L | .158 mg/L |
| 1/3/24 | DP2 | COD | 121 mg/L | 120 mg/L | - |
| 3/12/25 | DP2 | COD | 374 mg/L | 120 mg/L | - |

## 4. Failure to Implement BAT and BCT

Based on CEWS's self-reported data, CEWS's industrial storm water discharges illustrate a pattern of exceedances of water quality standards. This pattern of exceedances indicates that



OURCLEANOCEANS.ORG

Notice of Violations and Intent to File Suit
CEWS

CEWS has failed and is failing to employ measures that constitute BAT and BCT in violation of the requirements of the General Permit.

To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. (See General Permit Sections X.H.1-2.) CEWS could not have done this when its Zn results have exceeded the NEL eleven (11) times over the last three (3) reporting periods, with the most recent sample from 3/12/25 demonstrating a Zn concentration over six (6) times the NAL. Despite the numerous ERA and WQBCA reports and plans submitted by the Facility to purportedly eliminate these exceedances, the Facility's most recently collected sample also demonstrated an Al concentration over six (6) times the NAL, a COD concentration over three (3) times the NAL, and TSS in excess of the NAL.

Accordingly, CEWS has failed to implement the minimum BMPs required by the General Permit at the Facility, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. (General Permit Sections X.H.1(a–g)). CEWS has also failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including exposure minimization BMPs; storm water containment and discharge reduction BMPs; and treatment control BMPs. (General Permit Section X.H.2.) The BMPs described in the Facility's SWPPP are insufficient to prevent the NEL and NAL exceedances for the parameters listed above. Furthermore, the BMPs described in the Facility's ERA Reports and WQBCA Plans are also inadequate.

For example, the Facility's numerous ERA Reports and WQBCA Plans from 12/27/21 to present recycle the same BMP recommendations with slightly varied phrasing and/or exact duplication. The following are examples of the minimum BMPs selected for implementation that have essentially been restated in the Facility's historical ERA and WQBCA reporting: implement new daily housekeeping, spill response, and waste management procedures; minimum BMPs will be implemented more frequently; all employees have been assigned to clean and maintain their working area clean; cover and tarp roll-off bins prior to the onset of a rain event; the recycling metals with metal components will be separated and covered or stored indoors to avoid contact with storm water; scrap metal parts with zinc component will be covered or placed under roof any time that there is 50% chance of rain; scrap metal parts with aluminum component will be covered or placed under roof any time that there is 50% chance of rain; metal parts will be collected, piled, and covered when rains will be expected; and roll off containers will be covered when rain is expected. This pattern of regurgitation reflects the Facility's failure to consistently maintain the minimum BMPs required to limit the exposure of metals and other pollutants in its storm water discharges and to correct the recurring inadequacies contributing to the ongoing exceedances at the Facility.

Similarly, the following are examples of the advanced BMPs selected for implementation that have essentially been restated in the Facility's ERA and WQBCA reporting: prior to a 50% forecast of rain, media filter socks will be implemented across the entrance gates; prior to a 50% forecast of rain, media filter socks will be implemented and placed across the DP; media filter



Notice of Violations and Intent to File Suit
CEWS

has been purchased and will be placed at different down grading locations when there is 50% of
expected QSE; two different media filters will be placed at the discharge points, one type of
media filter will be for suspended solids and the other type will be for removal of dissolved
metals; media filter and ionic exchange resin will be placed around the areas where scrap metals
with aluminum components are stored when 50% of QSE is expected; media filter will be placed
at different locations of the yard when there is 50% of QSE is expected.  Notably, the above only
contains general references to media filter socks and media filters without providing a brand and
fails to identify the expected removal rates of these devices, their filtration capacity pertaining to
storm water volume or flow rates, or how the Facility plans to maximize the contact time of
storm water with these devices by reducing the potential for storm water overflow and bypass.
Similarly, the Facility's SWPPP also fails to provide this information, fails to identify any
implemented media at all, and only refers to a filter one (1) time as follows: "Storm water runoff
from the loading and unloading areas will be partially pretreat with roll socks with filter and
absorbent before it will be discharged in a near future."  Moreover, the aforementioned reports
and plans consistently fail to provide definitive locations where these filtration devices will be
placed, using phrases such as: "across the DP(s)," "at different down grading locations," "around
the areas where scrap metals with aluminum components are stored," and "at different locations
of the yard," all without specification  This lack specification prevents an accurate assessment of
the effectiveness of these measures and limits the ability of Facility personnel to receive
adequate training for effective implementation of these measures.  Unsurprisingly, every ERA
and WQBCA report/plan from 2/5/23 to present identify "failure to install filter media sock in
the discharge points" as a deficiency contributing to the Facility's exceedances, and state
"Employees will be retrained on BMPs implementation and storm water sampling procedures"
as a corrective action.

    Typically, a device intended to filter pollutants is considered an advanced BMP.  To ensure
the effectiveness of these types of control measures, they are required to meet the General
Permit's design storm standards. (General Permit Section X.H.2.b.iii). The design standards for
treatment control BMPs are listed in General Permit Section X.H.6.a-b. and are generally
calculated based upon either the volume of storm water run-off produced by the 85th percentile
24-hour storm event, or the maximum flow rate of storm water run-off produced by the 85th
percentile hourly rainfall intensity.  The Facility's reports, plans, and SWPPP all fail to explain
whether the media filter socks and media filters that were purportedly installed are capable of
treating the sufficient storm water volume or flow rate to comply with the General Permit's
design standard relative to the volume of run-off from areas of the Facility they are expected to
treat.  This information is critical for determining whether these filtration devices are an
adequate, effective BMP.  Consequently, OCO alleges that the media filter socks and media
filters result in an insufficient amount of the Facility's discharge actually being filtered, allowing
for bypass of unfiltered polluted discharge.

    The Facility's ERA and WQBCA reports/plans exhibit numerous contradictions that raise
concerns about their accuracy and effectiveness.  For example, the Facility's WQBCA Plan for
Cu, dated 12/16/23, states, "The storm water run on from the neighboring business will be
diverted from discharge to the yard."  Similarly, the Facility's Level 2 ERA Plan for Al, dated
12/30/23, states, "The storm water running on from neighbor building's rooftop will be diverted
from discharge to the yard."  However, the Facility's SWPPP explains that run-on is not an issue
at the Facility on Page 64 as follows: "Two storm water discharge points were observed at this



Notice of Violations and Intent to File Suit
CEWS

facility, affect by storm water runon from surrounding area was not identified, and sampling points are accessible." These ERAs also fail to include evidence substantiating that the roofs of neighboring businesses are discharging Cu and Al. As another example, the Facility's Level 2 ERA Plan, dated 12/30/23, also states, "Filter media have been placed in the storm water inlets grills to filter runoff." However, the Facility's site map only depicts one storm drain rather than multiple "storm water inlets grills." This seems to confirm OCO's allegation that the Facility's SWPPP and site map fail to account for all storm drains at the Facility and substantiate OCO's related concern that CEWS' sampling is not representative of all industrial activity at the Facility. Furthermore, the Facility's Level 1 ERA Report, dated 12/27/21, states, "media filter socks will be implemented across the entrance gates" although the site map depicts no discharge from these gates/driveways. Moreover, the Facility's WQBCA Plan from 12/16/2023, Level 2 ERA Action Plan from 12/30/23, Level 2 ERA Technical Report from 12/27/24, and WQBCA Plan from 3/11/2025 all state "Reduction or losses of workers to clean the yard during the Covid-19 pandemic" as a contributing cause of the Facility's exceedances despite the COVID-19 restrictions being lifted on June 15, 2021, and the samples referred to in these reports/plans being collected after June 15, 2021.

Additionally, information available to OCO indicates that the Facility has failed to implement certain advanced BMPs referenced in its ERA and WQBCA reports and plans. The Facility's Level 1 ERA Report, dated 2/5/23, states, "The following is a summary of the BMPs that are or will be implemented during (during the 2022 - 2023 wet season) to comply with IGP NAL for copper" and includes: "Trenches with grills will be placed in the yard to management runoff and sediment. In a near future submergible water pumps may be placed at the discharge points (entrances) to collect and pretreat the storm water runoff before it will be discharged if NALs continua exceedance" and "New Structure BMP (new trenching at the entrances) will be constructed in a future if needed." However, neither the Facility's SWPPP nor site map verify implementation of these BMPs, and no trench drains are visible from Google Earth. Further, as explained above, the site map depicts the driveways/entrances as having no discharge, raising questions about what the Facility's actual discharge locations are, and casting doubt on the legitimacy of these proposed BMPs.

Furthermore, the ERA and WQBCA reports/plans have repeatedly dangled an advanced treatment system as a proposed BMP for implementation if exceedances continued at the Facility. The Level 1 ERA Report from 2/5/23, the WQBCA Plan from 12/16/2023, the Level 2 ERA Action Plan from 12/30/2023, the Level 2 ERA Technical Report from 12/27/24, and the WQBCA Plan from 3/11/25 state the following in sequential order: "The Company will consult cost of storm water holding tanks, construction of storm water collection system, and a filter unit to treat the collected storm water if the BMPs failed to bring into compliance the discharge with NALs;" "If the advanced BMPs implementation failed to comply with NEL, a treatment alternative method or advanced BMPs will be considered to install at the site to treat all the storm water runoff. The treatment method or advance BMPs will be submitted and uploaded in SMARTS;" "The company may need to purchase holding water tanks and a filter unit to collect and filter some storm water if the BMPs failed to meet NAL;" "Storm water collection and treatment unit will go for bidding cost estimate if needed;" and "If the advanced BMPs implementation failed to comply with NEL, a treatment alternative method or advanced BMPs will be considered to install at the site to treat all the storm water runoff." Despite these repeated assertions and continuing NEL and NAL exceedances, the Facility has failed to install a



Notice of Violations and Intent to File Suit
CEWS

treatment system. Consequently, OCO alleges the Facility lacks a genuine intent to follow through with its own recommendations for measures required to prevent future exceedances.

Section II.E.1. of the General Permit Fact Sheet states, "Failure to comply with these additional Water Quality Based Corrective Action requirements is a violation of this General Permit. If additional operational source control measures do not adequately reduce the pollutants, Dischargers must implement additional measures such as the construction of treatment systems and/or overhead coverage." Accordingly, CEWS has failed to design and implement adequate BMPs to reduce or prevent pollutants in the Facility's discharges.

CEWS's failure to develop or implement adequate pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the General Permit every day CEWS discharges without meeting BAT/BCT. Each day CEWS failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA (33 U.S.C. § 1311(a)). Consequently, CEWS and its Owners and/or Operators have been in violation of the BAT and BCT requirements at the Facility every day since at least July 11, 2020.

As a result, OCW also alleges that CEWS has discharged storm water containing excessive levels of pollutants from the Facility to the receiving water body and its watershed during every local rain event over 0.1 inches over the past five (5) years (see **Attachment 1**). Each of these rain events represents a discharge of polluted storm water run-off in violation of the CWA and General Permit. CEWS is subject to civil penalties for each of these separate and distinct violations of the CWA and General Permit within the past five (5) years.

### 5. Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan

Section X of the General Permit states that dischargers shall develop and implement a site-specific SWPPP for their industrial facilities that includes: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

Further, Attachment D of the General Permit states that the Site Map shall include the following information: the facility boundary; storm water drainage areas within the facility boundary; portions of any drainage area impacted by discharges from surrounding areas and flow direction of each drainage area; on-facility surface water bodies; areas of soil erosion; location(s) of nearby water bodies (such as rivers, lakes, wetlands, etc.); location(s) of municipal storm drain inlets that may receive the facility's industrial storm water discharges and authorized Non-Storm Water Discharges (NSWDs); locations of storm water collection and conveyance systems and associated points of discharge, and direction of flow; any structural control measures (that affect industrial storm water discharges authorized NSWDs, and run-on); all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures; locations where materials are directly exposed to precipitation; locations



Notice of Violations and Intent to File Suit
CEWS

where significant spills or leaks identified have occurred; areas of industrial activity subject to this General Permit; all storage areas and storage tanks; shipping and receiving areas; fueling areas; vehicle and equipment storage/maintenance areas; material handling and processing areas; waste treatment and disposal areas; dust or particulate generating areas; cleaning and material reuse areas; and, any other areas of industrial activity which may have potential pollutant sources.

As explained above, the Facility's SWPPP fails to provide a narrative explanation of where the Facility's discharge points are located or to identify them by name; fails to identify and account for all storm drains at the Facility; fails to explain the relationship between this undepicted storm drain and the selected discharge/sampling locations at the Facility; fails to identify the Facility's driveways as discharge locations and explain whether they are assessed as industrial or non-industrial; fails to state the expected removal rates and treatment flow rates of the filtration devices deployed at the Facility, whether the filtration devices are capable of treating the sufficient storm water volume or flow rate to comply with the General Permit's design standard relative to the volume of run-off from areas of the Facility they are expected to treat, or how the Facility plans to maximize the contact time of storm water with these devices by reducing the potential for storm water overflow and bypass; fails to mention or describe any filter media at all despite numerous ERAs and WQBCAs referring to filter media; and fails to depict any trench drains despite the Facility's Level 1 ERA Report from 2/5/23 stating trenches would be installed.

Additional SWPPP deficiencies include, but are not limited to the following:

a.  Section X.F of the General Permit requires Dischargers to ensure the SWPPP includes a list of industrial materials handled at the facility, and the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency.
     i.  Page 35 of the Facility's SWPPP refers to "metal powders" and "shredded paper" being "contained and stored out of contact with storm water" but the SWPPP's List of Industrial Materials fails to include these materials.

b.  Section X.G.1.a of the General Permit states, "The Discharger shall ensure the SWPPP describes each industrial process including: manufacturing, cleaning, maintenance, recycling, disposal, generation of by products (including, but not limited to, air particulate emissions), and any other activities related to the process. The type, characteristics, and approximate quantity of industrial materials used in or resulting from the process shall be included. Areas protected by containment structures and the corresponding containment capacity shall be identified and described."
     i.  The Facility's SWPPP fails to adequately describe the generation of byproducts, specifically dust and particulates, from the Facility's industrial processes.  For example, the SWPPP refers to metal chips, metal dusts, metal dusts from oxidized and corroded metals, metal powders, and shredded paper which are all associated with dust and particulate generation.  The SWPPP's BMP Summary Table associates dust and particulate generation with loading and unloading areas, outdoor scrap metal storage, and storage bins and roll-offs.  However, the SWPPP fails to explain how the dismantling, shredding (metals), and compacting (metals)



OUR CLEAN OCEANS     OURCLEANOCEANS.ORG                                    16
PROTECT & PRESERVE

Notice of Violations and Intent to File Suit
CEWS

processes identified in the SWPPP generate dust and particulate byproducts. Similarly, the SWPPP refers to the presence of shredded paper but fails to explain if shredding of paper at the Facility produces dust and particulates.

    ii. As a result, the Facility's SWPPP also fails to assess and determine the extent these dust and particulates are exposed to the outdoors as potential pollutants through the Facility building's ventilation system via roof vents/exhausts or roof equipment. The section of the SWPPP entitled "Dust & particulate generating activities" merely assesses the dust and particulates associated with the Facility's industrial activities as follows: "The dust generated from the industrial activities at this facility is associated to the recycling materials received at the facility and ground conditions. It is associated to dust and dirt that the scrap metals are bringing from their originated site." This failure is highlighted by the identification of the building roof as a source of pollutants contributing to the Facility's exceedances in the Facility's WQBCA Plans.

c. Section X.G.1.b of the General Permit states, "The Discharger shall ensure the SWPPP describes each material handling and storage area, including: the type, characteristics, and quantity of industrial materials handled or stored; the shipping, receiving, and loading procedures; the spill or leak prevention and response procedures; and the areas protected by containment structures and the corresponding containment capacity."

    i. The Facility's SWPPP refers to a Dismantling Area in numerous sections and this area is depicted on the Facility's sit map. However, the SWPPP's "List of Industrial Materials" fails to identify the type, characteristics, and quantity of industrial materials handled or stored in this area. Further, the SWPPP section entitled "Description of Potential Pollutant Sources" fails to include/describe the Dismantling Area as does the SWPPP's BMP Summary Table.

d. Section X.G.1.c of the General Permit states, "The Discharger shall ensure the SWPPP describes all industrial activities that generate a significant amount of dust or particulate that may be deposited within the facility boundaries. The SWPPP shall describe such industrial activities, including the discharge locations, the source type, and the characteristics of the dust or particulate pollutant." As explained above, the SWPPP fails to identify all industrial activities that generate a significant amount of dust or particulate.

e. A SWPPP shall identify and evaluate pollutants that may affect the quality of industrial storm water discharges and authorized non-storm water discharges. (General Permit Section X.C.1.a.). Additionally, Section X.G.2.a of the General Permit requires a SWPPP to include a narrative assessment of all areas of industrial activity with potential industrial pollutant sources. At a minimum, the assessment shall include: the areas of the facility with likely sources of pollutants in industrial storm water discharges and authorized NSWDs; the pollutants likely to be present in industrial storm water discharges and authorized NSWDs; the approximate quantity, physical characteristics (e.g., liquid, powder, solid, etc.), and locations of each industrial material handled, produced, stored, recycled, or disposed; the effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs; the estimated effectiveness of implementing, to the extent feasible, minimum BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs;



OURCLEANOCEANS.ORG

Notice of Violations and Intent to File Suit
CEWS

and, the identification of the industrial pollutants related to the receiving waters with 303(d) listed impairments identified in Appendix 3 or approved TMDLs that may be causing or contributing to an exceedance of a water quality standard in the receiving waters.

    i. As explained above, the Facility's SWPPP fails to include a narrative assessment of the dismantling, shredding, and compacting activities identified in the Facility's SWPPP. Therefore, the Facility's SWPPP fails to comply with this requirement to the extent required by the General Permit.

    ii. The SWPPP fails to identify the 303(d) listed impairments applicable to the Facility's receiving water body as well as the impaired pollutants applicable to the Facility's HUC-10 Watershed.

    iii. Accordingly, the Facility's SWPPP fails to identify and evaluate all pollutants that are likely to be present in and that may affect the quality of the Facility's industrial storm water discharges and authorized non-storm water discharges, especially those associated with impairments that may be cause or contribute to an exceedance of a water quality standard in the Facility's receiving waters.

    iv. The Facility also fails to adequately assess the effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs as well as the estimated effectiveness of implementing, to the extent feasible, minimum BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs because the Facility cannot sufficiently make this assessment without properly identifying and assessing all applicable 303(d) and HUC-10 pollutants. Further, as explained above, the Facility has continually failed to implement the requisite minimum BMPs to reduce or prevent pollutants in its industrial storm water discharges as evidenced by the Facility's ongoing exceedances.

f. Section X.G.2.b requires Dischargers to identify in the SWPPP any areas of the facility where the minimum BMPs described in subsection H.1 will not adequately reduce or prevent pollutants in storm water discharges in compliance with Section V.A. Dischargers shall identify any advanced BMPs, as described in subsection H.2, for those areas. (General Permit Section X.G.2.b). The SWPPP fails to satisfy this requirement. For example, the SWPPP fails to identify and implement roof downspout filters as an advanced BMP for the building's roof despite the Facility's WQBCA Plans identifying the roof as a pollutant source and exceedances continuing at the Facility.

g. Section X.G.2.d requires Dischargers to identify in the SWPPP any additional parameters, beyond the required parameters in Section XI.B.6 that indicate the presence of pollutants in industrial storm water discharges. As explained above, the SWPPP fails to identify and assess for applicable 303(d) and HUC-10 parameters that may be present in the Facility's industrial materials and activities.

h. Section X.E of the General Permit requires Dischargers to prepare a site map that identifies all industrial storage areas and storage tanks, shipping and receiving areas, fueling areas, vehicle and equipment storage/maintenance areas, material handling and processing areas, waste treatment and disposal areas, dust or particulate generating areas, cleaning and material reuse areas, and other areas of industrial activity that may have



OURCLEANOCEANS.ORG

18

potential pollutant sources.  Additionally, the Discharger shall include storm water drainage areas within the facility boundary.  The Facility's site map deficiencies include, but are not limited to:

    i.   Failure to identify all storm drains located at the Facility and the associated drainage conveyances.

    ii.   Failure to properly depict storm water flow/discharge from the Facility's driveways (i.e. entrances/exits).

    iii.   Failure to identify the building's roof downspouts and flow directions.

    iv.   Failure to identify the "Employee Parking Area" as a drainage Area.

    v.   Failure to distinguish industrial from non-industrial areas.

    vi.   Failure to identify the shop and maintenance area(s).

    vii.   Failure to identify the shredder(s) and compactor(s) as dust or particulate generating areas/activities.

    viii.   Failure to specifically identify the hazardous waste storage area(s).

Section X.B. of the General Permit also requires CEWS to revise its SWPPP whenever necessary and certify and submit its SWPPP to SMARTS within 30 days of any facility changes that require significant SWPPPP revisions(s), and to certify and submit via SMARTS any non-significant revisions not more than once every three (3) months in the reporting year.  (General Permit Section X.B).  Accordingly, facilities with discharges in violation of the General Permit's Receiving Water Limitations and/or water quality standards must implement additional BMPs or other control measures to achieve compliance with applicable receiving water limitations.  The SWPPP must be updated with the additional BMPs that will be implemented to achieve water quality standards, along with an implementation schedule.  (General Permit Section I.E).  The Facility's SWPPP updates do not include adequate BMPs to achieve applicable water quality standards as demonstrated by the continuing NEL and NAL exceedances.

Furthermore, the Facility's most recent SWPPP on SMARTS lists a revision date of 2/2/23 and was updated to reflect the BMPs selected for implementation by the Facility's Level 1 ERA Report for Cu.  The Facility has submitted a Level 2 ERA Plan and two (2) WQBCA Plans since 2/2/23.  Although each ERA and WQBCA plan requires the implementation of additional BMPs to mitigate exceedances and achieve water quality standards, the SWPPP was not updated to reflect any of the additional BMPs the Facility purportedly committed to implementing in these plans.  Moreover, the Level 2 ERA Plan from 12/30/23 states that the Facility's SWPPP was updated despite the last documented update on SMARTS being 2/2/23.  Similarly, the WQBCA Plan dated 12/30/23 also states the SWPPP was updated despite the last update being 2/2/23.  The Facility's has also failed to update its SWPPP to reflect the new BMPs identified in its WQBCA Plan from 3/11/2025 despite also stating the SWPPP has been updated.  This failure is in direct violation of the letter issued by the Regional Board on February 19, 2025, requiring the Facility to upload a revised SMPPP to SMARTS reflecting all new corrective action measures implemented or planned in this WQBCA Plan by March 20, 2025.  As such, the Facility has failed to develop and update its SWPPP as required and is in daily violation of the General Permit and CWA.

Every day CEWS fails to develop and implement an adequate SWPPP is a violation of the General Permit.  CEWS has been in violation of the General Permit Section X requirements at the Facility every day since at least July 11, 2020.

 OURCLEANOCEANS.ORG

Notice of Violations and Intent to File Suit
CEWS

6. **Failure to Develop and Implement an Adequate Monitoring and Reporting
   Program and to Perform Annual Comprehensive Site Compliance
   Evaluations**

The General Permit requires Facility operators to develop and implement a
Monitoring Implementation Program ("MIP"). (General Permit Section X.I).  The MIP is
required to ensure that the Facility adequately detects and measures its storm water discharges to
ensure compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water
Limitations specified in the Industrial General Permit.  (General Permit Fact Sheet Section
II.J(1)).  Facility operators must ensure that their MIP practices reduce or prevent pollutants in
storm water and authorized non-storm water discharges as well as evaluate and revise their
practices to meet changing conditions at the Facility. (General Permit Section I.K(70)).  This
may include revising the SWPPP as required by General Permit Section I.K(69).

In order to adequately detect and measure its storm water discharges to ensure compliance
with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations
specified in the Industrial General Permit, CEWS is required to visually observe and collect
samples of storm water from all locations where storm water is discharged unless an exception
applies.  (General Permit Section XI.A).  This includes collecting at least two (2) samples from
each discharge location at the Facility during the first half of the reporting year, and at least two
(2) samples from each discharge location during the second half of the reporting year.  (General
Permit Section XI.B).  As explained above, samples are required to be analyzed for SIC code
required parameters, additional pollutants present in industrial activities that are potentially
exposed to storm water, applicable 303(d) parameters, applicable HUC-10 parameters, and
applicable TMDL parameters.  As also explained above, the Facility has failed to sufficiently
identify and assess applicable 303(d) and HUC-10 parameters, failed to analyze numerous storm
water samples for all of the pollutants/parameters identified in its SWPPP, and failed to collect
the required number of QSEs for two of the five reporting years applicable to this notice.

CEWS has been operating the Facility with an inadequately developed and/or inadequately
implemented MIP, in violation of the substantive and procedural requirements set forth in
Section B of the Industrial General Permit.  CEWS's monitoring has not resulted in practices at
the Facility that adequately reduce or prevent pollutants in storm water as required by Section XI
of the General Permit.  This is evidenced by the continued exceedances at the Facility since at
least the 2020-2021 reporting year.  Therefore, CEWS has been in daily and continuous violation
of the General Permit's MIP requirements every day since at least July 11, 2020.  Every day that
CEWS operates with an inadequate MIP is a separate and distinct violation of the General Permit
and the CWA.  As such, CEWS is subject to civil penalties for all associated violations of the
CWA since July 11, 2020.

Section XV of the General Permit requires Dischargers to conduct an Annual Comprehensive
Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current
BMPs and the need for additional BMPs based on visual observations and sampling data.  This
Annual Evaluation must include an assessment of all BMPs for each area of industrial activity
and associated potential pollutant sources to determine if the BMPs are properly designed,
implemented, and effective in reducing and preventing pollutants in industrial storm water



Notice of Violations and Intent to File Suit
CEWS

discharges and authorized NSWDs.  The Facility's historical sampling data in the above table
indicates the Facility has consistently failed to comply with this requirement.  This failure to
comply negates a key component of the evaluation process required in self-monitoring programs
such as the General Permit, and in CEWS's case, has resulted in continued NEL and NAL
exceedances.  CEWS is in ongoing violation of the General Permit and CWA every day that the
Facility operates without evaluating the effectiveness of BMPs and the need for additional
BMPs.  Each of these violations is a separate and distinct violation of the General Permit and the
CWA.  CEWS is subject to civil penalties for all violations of the CWA occurring over the past 5
years.

### 7.  Failure to Comply with the General Permit's Reporting Requirements

A Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th
following each reporting year using the standardized format and checklists in SMARTS.
(General Permit Section XVI).  The Annual Report requires a Discharger to answer pre-
populated compliance assessment questions and explain any instances of non-compliance.  A
Discharger's responses are certified under penalty of perjury by a Legally Responsible Person
(LRP) for the reporting facility (i.e. Discharger).

The deficiencies and violations detailed within this notice indicate the Facility has failed to
accurately report its non-compliance with the General Permit in the Facility's Annual Reports.
Additionally, the Annual Reports submitted by the Facility include numerous misrepresentations.
For example, every Annual Report submitted during the five-year period applicable to this notice
falsely certifies that the Facility has included the applicable HUC-10 pollutants in the SWPPP
pollutant source assessment and assessed the need for analytical monitoring for those pollutants.
However, the Facility's SWPPP has failed and continues to fail to include these pollutants and/or
an assessment during those reporting periods.  Furthermore, the Facility's 2019-2020 and 2021-
2022 Annual Reports also falsely certify that the Facility sampled the required number of QSEs
during those reporting years although the Facility failed to sample the required number of four
(4) QSEs during those reporting periods.  Therefore, CEWS is in continuous violation of the
General Permit.

Section XI.B.11.a of the General Permit requires dischargers to submit all sampling and
analytical results via SMARTS within 30 days of obtaining all results for each sampling event
from the laboratory. The Facility failed to meet this reporting requirement, in violation of the
General Permit, for the following sampled rain events: 3/10/2021, 3/15/21, 1/22/24, and 2/1/24.

As explained above, the General Permit requires facilities to submit various ERAs to the
SWRCB outlining effective plans to reduce pollutants if a facility experiences an NAL
exceedance for a parameter in a given reporting year.  The BMPs outlined in these ERAs are
expected to eliminate future exceedances.  Furthermore, General Permit Section I.C.36 also
requires dischargers to submit WQBCA Plans via SMARTS to the Regional Water Board when
discharges violate the General Permit's receiving water limitations or water quality standards,
such as a TMDL NEL.  WQBCA Plans are intended to eliminate parameter exceedances that are
especially harmful to impaired water bodies that are sensitive to the pollution those parameters
cause.



Notice of Violations and Intent to File Suit
CEWS

CEWS has not complied with the ERA or WQBCA Plan reporting requirements in good faith. CEWS has chosen to implement BMPs and control measures that are insufficient to adequately mitigate the NAL and NEL exceedances and violations occurring at the Facility. This is evidenced by the Facility's self-reported sample results continuing to have Zn exceedances of both the NAL and TMDL NEL. The Facility's implementation of inadequate control measures is also highlighted by CEWS's ERA and WQBCA reports/plans repeatedly identifying the same BMP deficiencies and recommendations and the Facility's continued decision not to implement the advanced treatment system recommendations in this reporting.

Furthermore, as also explained above, the Facility's ERA and WQBCA reports/plans fail to explain the expected removal rates and treatment flow rates of the filtration devices deployed at the Facility, whether the filtration devices are capable of treating the sufficient storm water volume or flow rate to comply with the General Permit's design standard relative to the volume of run-off from areas of the Facility they are expected to treat, or how the Facility plans to maximize the contact time of storm water with these devices by reducing the potential for storm water overflow and bypass.

As a result, the Facility has failed to prepare, implement, and report for its Water Quality Based Corrective Actions as required by the General Permit. Consequently, the Facility is in violation of the General Permit and the CWA. Each day the Facility operates with inadequate reporting is a separate and distinct violation of the General Permit and CWA. These violations are ongoing and continuous and CEWS is subject to civil penalties for all violations of the CWA occurring over the past 5 years.

## III. PERSON RESPONSIBLE FOR THE VIOLATIONS

CEWS, and its Owners and/or Operators are responsible for the violations at the Facility described in this notice letter.

## IV. NAME AND ADDRESS OF NOTICING PARTY

Our Clean Oceans, Inc.
2618 San Miguel, Suite 1885
Newport Beach, CA 92660
Phone: 833-241-8799
info@ourcleanoceans.org

## V. LEGAL COUNSEL

Mares Legal, P.C.
Tim Mares, Esq.
240 W Chapman Ave., Suite 200
Orange, CA 92866
(310) 940-7433
tim@mareslegalpc.com

 OURCLEANOCEANS.ORG

22

Notice of Violations and Intent to File Suit
CEWS

## VI. Conclusion

OCO is willing to discuss effective remedies for the violations described in this notice letter before the end of the 60-day notice period.  If OCO's legal counsel is promptly notified, it may be possible to avoid litigation.  However, as previously stated, if no resolution is reached by the close of the 60-day notice period, OCO intends to file suit under CWA section 505(a) against CEWS for the above referenced violations.  If CEWS or its representatives wish to engage in settlement discussions, please contact OCO's legal counsel listed above.

Sincerely,

*Tim Mares*

Tim Mares, Esq.



OURCLEANOCEANS.ORG                                                                          23

Notice of Violations and Intent to File Suit
CEWS

## SERVICE LIST

**Via U.S. Mail**

Pam Bondi
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Lee Zeldin
Administrator
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460 (1101A)

Eric Oppenheimer
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812-0100

Josh F.W. Cook
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Jayne Joy
Executive Officer
Santa Ana Regional Water Quality Control Board
3737 Main Street, Suite 500
Riverside, California 92501



Notice of Violations and Intent to File Suit
CEWS

## ATTACHMENT 1
Fullerton Municipal Airport (USW00003166)
Days with Precipitation over 0.1 inches

| | | |
|---|---|---|
| 11/7/2020 | 2/23/2023 | 2/6/2025 |
| 12/28/2020 | 2/24/2023 | 2/7/2025 |
| 1/23/2021 | 2/25/2023 | 2/12/2025 |
| 1/25/2021 | 2/27/2023 | 2/13/2025 |
| 1/28/2021 | 2/28/2023 | 2/14/2025 |
| 1/29/2021 | 3/1/2023 | 3/5/2025 |
| 3/3/2021 | 3/10/2023 | 3/6/2025 |
| 3/10/2021 | 3/11/2023 | 3/13/2025 |
| 3/11/2021 | 3/14/2023 | 4/26/2025 |
| 3/15/2021 | 3/15/2023 | |
| 7/26/2021 | 3/20/2023 | |
| 10/4/2021 | 3/21/2023 | |
| 10/25/2021 | 3/22/2023 | |
| 12/14/2021 | 3/29/2023 | |
| 12/23/2021 | 3/30/2023 | |
| 12/24/2021 | 5/4/2023 | |
| 12/25/2021 | 8/20/2023 | |
| 12/27/2021 | 8/21/2023 | |
| 12/29/2021 | 11/15/2023 | |
| 12/30/2021 | 12/20/2023 | |
| 2/15/2022 | 12/21/2023 | |
| 3/19/2022 | 12/22/2023 | |
| 3/28/2022 | 1/3/2024 | |
| 4/22/2022 | 1/20/2024 | |
| 6/22/2022 | 1/22/2024 | |
| 9/9/2022 | 2/1/2024 | |
| 10/15/2022 | 2/4/2024 | |
| 11/2/2022 | 2/5/2024 | |
| 11/8/2022 | 2/6/2024 | |
| 12/11/2022 | 2/7/2024 | |
| 12/12/2022 | 2/19/2024 | |
| 12/27/2022 | 2/20/2024 | |
| 12/30/2022 | 2/21/2024 | |
| 1/3/2023 | 3/2/2024 | |
| 1/4/2023 | 3/6/2024 | |
| 1/5/2023 | 3/23/2024 | |
| 1/9/2023 | 3/30/2024 | |
| 1/10/2023 | 3/31/2024 | |
| 1/14/2023 | 4/5/2024 | |
| 1/15/2023 | 4/13/2024 | |
| 1/16/2023 | 4/14/2024 | |
| 1/19/2023 | 5/5/2024 | |
| 1/30/2023 | 1/26/2025 | |



OURCLEANOCEANS.ORG